Curtis DOMME, Nora Bess Domme, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 94–2136.

United States Court of Appeals, Tenth Circuit.

July 31, 1995.

---

David A. Freedman (J. Michele Guttmann, with him on the briefs), Freedman, Boyd, Daniels, Peifer, Hollander, Guttmann & Goldberg, P.A., Albuquerque, NM, for appellants.

Robin D. Smith, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC (Frank W. Hunger, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, DC; John J. Kelly, U.S. Atty., Albuquerque, NM; Paul F. Figley, Deputy Director, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, with him on the brief), for appellee.

Before TACHA, Circuit Judge, ALARCÓN,* Senior Circuit Judge, and HENRY, Circuit Judge.

---

* The Honorable Arthur L. Alarcón, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

TACHA, Circuit Judge.

## Background

Sandia National Laboratories (SNL), located on Kirtland Air Force Base near Albuquerque, New Mexico, conducts federally sponsored defense-related research. The United States government owns all of the land, buildings, and other property at SNL. Sandia Corporation (Sandia) manages and operates SNL under a contract with the Department of Energy (DOE). Plaintiff Curtis Domme was employed by Sandia as a high-voltage electrician. On July 15, 1989, Sandia conducted a planned electrical outage. While participating in this procedure, plaintiff was severely burned in an electrical explosion.

Plaintiffs sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), alleging that the government was liable for the DOE's negligent oversight of Sandia. Defendant moved to dismiss or, in the alternative, for summary judgment. Although the district court denied defendant's motion, the court subsequently raised, sua sponte, the question of whether plaintiffs' claims were barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), and asked both parties to brief the issue. Concluding that the discretionary function exception shielded the government from liability, the district court dismissed plaintiffs' complaint. Plaintiffs appeal, arguing that (1) the government's common-law landowner duties to plaintiffs are not shielded by the discretionary function exception to the FTCA, and (2) the DOE's failure to comply with its own safety standards and procedures was not a decision based on considerations of public policy.

## Discussion

Under the FTCA, the United States waives its sovereign immunity with respect to certain injuries caused by government employees acting within the scope of their employment. 28 U.S.C. § 1346(b). The FTCA contains an exception to this broad waiver of immunity, however, for claims "based upon

the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a). Section 2680(a) is commonly referred to as the "discretionary function exception" to the FTCA. *See Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1537 (10th Cir.1992). "The discretionary function exception ... marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). If the discretionary function exception applies to the challenged governmental conduct, the United States retains its sovereign immunity and the district court lacks subject matter jurisdiction to hear the suit. *See Johnson v. United States Dep't of Interior,* 949 F.2d 332, 335 (10th Cir.1991). "[A]pplication [of the exception] therefore presents a threshold jurisdictional determination which we review de novo." *Daigle,* 972 F.2d at 1537.

█ Plaintiffs argue that the discretionary function exception simply does not apply to "mandatory common law duties." Plaintiffs seem to misunderstand FTCA case law.[1] In determining whether the discretionary function exception applies to particular governmental conduct, we must apply the two-step analysis developed by the Supreme Court in *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). *See*

*Black Hills Aviation, Inc. v. United States,* 34 F.3d 968, 972 (10th Cir.1994); *Kiehn v. United States,* 984 F.2d 1100, 1102 (10th Cir.1993); *Daigle,* 972 F.2d at 1538; *Johnson,* 949 F.2d at 336; *Boyd v. United States ex rel. United States Army, Corps of Eng'rs,* 881 F.2d 895, 897 (10th Cir.1989). The *Berkovitz* inquiry is necessary in *all* FTCA cases. *See Johnson,* 949 F.2d at 335 ("Application of this exception is therefore a threshold issue—a jurisdictional issue which precedes any negligence analysis."). Only if the United States waives its sovereign immunity pursuant to the FTCA does the question of whether the government owed the plaintiffs a duty of care under state law arise. Because the district court decided the jurisdictional question in favor of the United States, the only issue in this appeal is whether the district court correctly concluded that the government's conduct is shielded by the discretionary function exception.

█ Turning to the *Berkovitz* framework, "a court must first consider whether the action is a matter of choice for the acting employee." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958. Conduct that does not involve an element of judgment or choice on the part of the government employee cannot be discretionary conduct. *Id.* Consequently, the discretionary function exception does not shield conduct that is specifically mandated by a federal statute, regulation, or policy. *Id.* In such instances, "the [government] employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no dis-

---

1. We note that plaintiffs rely heavily on our decision in *Smith v. United States,* 546 F.2d 872 (10th Cir.1976), a case decided before the Supreme Court's decision in *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). In *Smith,* we held that the National Park Service's decision not to erect warning signs around a super-heated thermal pool in Yellowstone Park was not shielded by the discretionary function exception. 546 F.2d at 877. Plaintiffs contend that the court's references to the government's status as a landowner in *Smith* support their argument that the discretionary function exception is inapplicable here because the government's duty to ensure safety at SNL arises out of its ownership of the land. *See id.* We disagree.

First, *Smith* acknowledged that the availability of the discretionary function exception is a threshold jurisdictional question that must be analyzed before addressing whether the government owed a duty of care to the plaintiff. *See id.* at 875–76. Second, reading the opinion in its entirety reveals that the court focused on the precise conduct at issue, and not the government's status as a landowner. *Id.* at 876–77; *see also Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764 ("[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case."). Consequently, *Smith* merely confirms that we should evaluate the specific conduct at issue using the *Berkovitz* test.

cretion in the conduct for the discretionary function exception to protect." *Id.*

If the conduct involves discretionary judgment, we proceed to the second prong of *Berkovitz* and "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958; *see also Kiehn,* 984 F.2d at 1103. "The [discretionary function] exception ... protects only governmental actions and decisions based on considerations of public policy." *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959. Thus, the "exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Id.*

■ Our initial task in applying the *Berkovitz* framework to this case is to ascertain the precise governmental conduct at issue. *See Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764 ("[T]he nature of the conduct ... governs whether the discretionary function exception applies in a given case."); *Johnson,* 949 F.2d at 338. In their complaint, plaintiffs allege that the United States breached its duty to maintain its property in a reasonably safe condition and to warn of potential hazards arising out of the conditions of the facilities. Plaintiffs further allege that DOE had specific regulations requiring it "to provide and maintain a safe workplace." It thus appears that the challenged conduct is the failure of DOE employees to ensure that SNL was a safe workplace for employees of Sandia, specifically by assuring that Sandia complied with all applicable safety regulations.[2] We turn therefore to an examination of DOE's responsibilities for safety at Sandia; in particular, we must examine "whether the challenged actions were ... controlled by mandatory statutes or regulations." *United States v. Gaubert,* 499 U.S. 315, 328, 111 S.Ct. 1267, 1276, 113 L.Ed.2d 335 (1991).

Sandia enjoys substantial autonomy in its operation of SNL. *See United States v. New Mexico,* 455 U.S. 720, 722–25, 102 S.Ct. 1373, 1376–78, 71 L.Ed.2d 580 (1982) (describing generally the relationship between DOE and Sandia). Despite its general autonomy, Sandia is contractually obligated to comply with all applicable safety regulations and standards. Moreover, under the parties' contract DOE retained "the right ... to inspect and audit in such manner as it deems appropriate all activities of Sandia." DOE has further defined its oversight role in a number of DOE-promulgated orders.

Plaintiffs contend that two DOE orders mandate specific conduct by DOE employees. DOE Order 5482.1B establishes DOE's environmental protection, safety, and health appraisal program for DOE-controlled operations. One of the stated purposes of the appraisal program is to "[p]rovide safe and healthful workplaces and conditions of employment for all employees of DOE and DOE contractors." DOE Order 5482.1B. The appraisal program requires DOE to "[c]onduct [ ] reviews of facilities and operations, including technical safety appraisals." *Id.* The order further directs that

[t]he quality, frequency, and depth of appraisals shall be commensurate with the hazard attendant with the respective operating activities; consistent with both the DOE policy of comparability and equivalence with similar regulatory programs; and consistent with DOE policy of protection of personnel, property, and the environment. Reviews and appraisals of DOE facilities and line organizations will be conducted, as appropriate, by the line organizations as part of line management's [environment protection, safety, and health] responsibility.

*Id.*

The second order at issue establishes an occupational safety and health program for DOE contractor employees. DOE Order 5483.1A. This order requires contractors that operate government-owned facilities to comply with a number of specified Occupa-

---

2. Plaintiffs suggest that DOE's alleged failure to warn Sandia workers of unsafe conditions at SNL is a discrete allegation of negligent omission, separate from plaintiffs' allegation that DOE failed to ensure a safe workplace. In our view, however, any failure to warn on the part of DOE should be considered part of DOE's overall conduct with regard to ensuring safety. *See Miller v. United States,* 710 F.2d 656, 665 (10th Cir.), cert. denied, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983).

tional Safety and Health Administration (OSHA) standards. *Id.* ch. I.1. Also pursuant to this order, DOE employees are required to perform compliance inspections of government-owned contractor-operated facilities in accordance with procedures outlined in the order. *Id.* 7.d(6). Those procedures require DOE employees to

> conduct unannounced compliance inspections of [government-owned contractor-operated] facilities, using the DOE-prescribed OSHA standards as requirements. These inspections are in addition to occupational safety and health appraisals or audits required by any other DOE Order, and shall be conducted on a priority basis with respect to the safety and health hazards involved and the number of employees affected. The compliance inspection may be a separate visit or it may be a part of a visit scheduled for other safety and health-related purposes. The inspection shall be conducted so that a representative sample ... of each ... facility is inspected every year. Where violations of the DOE-prescribed OSHA standards are noted, appropriate follow-up actions shall be taken to assure the effectiveness of corrective actions taken on deficiencies noted during initial compliance inspections.

*Id.* at ch. I.6.

Plaintiffs do not allege that DOE did not perform any safety inspections. Rather, plaintiffs argue that the inadequate manner in which DOE implemented their inspection programs failed to assure a safe workplace.

The DOE orders reflect DOE's intent to promote workers' safety at its contractor-operated facilities by policing contractor compliance with safety standards and procedures. To further this policy, the orders require DOE employees to conduct appraisals of the contractor's operations. Neither of these orders, however, specify the precise

manner in which DOE will conduct these safety appraisals. Indeed, the orders expressly allow the appropriate DOE employees to use their discretion in conducting reviews and inspections "consistent with DOE policy of protection of personnel, property, and the environment." DOE Order 5482.1B. We therefore conclude that the governmental conduct in question was not the result of mandatory and specific regulations.[3] Instead, the regulations allowed the government's employees to exercise choice and discretion. Having so decided, we must now turn to the second step of *Berkovitz.*

This second step requires us to determine whether the governmental conduct at issue is the result of judgment "of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958; *see also Zumwalt v. United States,* 928 F.2d 951, 953 (10th Cir.1991). The *Berkovitz* Court concluded that Congress intended the discretionary function exception to shield governmental decisions based on considerations of social, economic, and political policy. 486 U.S. at 536–37. In this case, plaintiffs contend that, even if DOE employees exercised discretion, any such discretion was not policy-based. The government argues, however, that its decisions regarding safety inspections at Sandia were shaped by a number of policy considerations, such as how best to allocate DOE's available resources.

In the Supreme Court's most recent case involving the discretionary function exception, the Court stated:

> When established governmental policy ... allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.... The focus of the inquiry is not on the agent's subjec-

---

3. For an example of government regulations that mandate specific conduct, see *Phillips v. United States,* 956 F.2d 1071 (11th Cir.1992). In *Phillips,* the Army Corps of Engineers was allegedly negligent in its oversight of a building contractor. The plaintiff, an employee of the contractor, was injured when the scaffolds on which he was working collapsed. *Id.* at 1073. The Corps had issued specific inspection requirements for this construction project, including a directive that

Corps employees "perform 'field safety inspections every time they visit a construction site.'" *Id.* (quoting the Army Corps of Engineers's document). Because of this specific mandatory directive, the *Phillips* court found that the government's conduct was not a matter of discretion. *Id.* at 1076–77. Thus, the challenged conduct did not meet the first prong of *Berkovitz. See id.* at 1077.

tive intent in exercising the discretion conferred by ... regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert,* 499 U.S. at 324–25, 111 S.Ct. at 1274–75. *Gaubert* involved the actions of federal bank regulators, who supervised the operations of a thrift institution. The Court first determined that the governmental actions at issue were not controlled by mandatory regulations, but were instead discretionary. *Id.* at 329, 111 S.Ct. at 1277. The Court then reasoned that statutes and regulations "established governmental policy which is presumed to have been furthered when the regulators exercised their discretion to choose from various courses of action." *Id.* at 332, 111 S.Ct. at 1278. Because the regulators' actions "were directly related to public policy considerations regarding federal oversight of the thrift industry," the actions were protected from suit by the discretionary function exception. *Id.*

Plaintiffs in the present case contend that, unlike the governmental conduct in *Gaubert,* the government's failure to ensure safety at SNL was not based on considerations of public policy. Three other circuits have addressed the second prong of *Berkovitz* in the context of government oversight of an independent contractor. The challenged conduct in *Kirchmann v. United States,* 8 F.3d 1273 (8th Cir.1993), was the Air Force's oversight of the construction of a missile facility. Because "no statute or regulation control[led] the government's monitoring of [the] contractor's work," the government's conduct was "necessarily a question of judgment[ ] or discretion." *Id.* at 1276. The court further held that the government's exercise of discretion was based on policy considerations, because the Air Force needed to balance its need for rapid construction with "the desirability of supervising closely the day-to-day operations of the contractors." *Id.* at 1277.

In a recent Fourth Circuit decision, the plaintiff was injured when she slipped and fell in a building leased by the United States. *Williams v. United States,* 50 F.3d 299, 301 (4th Cir.1995). The government had engaged an independent contractor to provide custodial and maintenance services for the building. *Id.* at 302. The plaintiff's claims against the United States alleged that the government negligently (1) hired the independent contractor, (2) failed to inspect the premises, and (3) failed to warn of the dangerous condition. *Id.* at 308. Because the government considered "a veritable plethora of factors before arriving at the decision to engage [the independent contractor]," the court held that the decision was shielded by the discretionary function exception. *Id.* at 310. Moreover, the failure to inspect and failure to warn allegations were similarly shielded "because these decisions [were] embraced by the overarching decision to engage [the contractor]." *Id.*

Finally, in *Routh v. United States,* 941 F.2d 853 (9th Cir.1991), the plaintiff alleged that the United States Forest Service was negligent in its supervision of a road-clearing project conducted by an independent contractor. *Id.* at 853. Federal regulations required the Forest Service to "notify the Contractor of any noncompliance with [safety standards] and of the corrective action required." *Id.* at 854 (quoting 48 C.F.R. Ch. 1, § 52.236–13 (amended 1991)). Because it was undisputed that the Forest Service was aware of the specific safety procedure violation that caused the plaintiff's injury, the issue was whether the Forest Service's failure to notify the contractor and require appropriate corrective action was shielded by the discretionary function exception. *Id.* at 855. The court held that, although the regulations allowed the government discretion, the discretion was not grounded in policy considerations. *Id.* at 856. Consequently, the Forest Service's conduct was not shielded by the discretionary function exception. *Id.* at 857.

In the instant case, we conclude that the government's choices with regard to its appraisal and inspection program at SNL were based on considerations of public policy. First, the order directing DOE employees to conduct appraisals of contractor-operated facilities requires them to consider protection of the environment, public health and safety, worker health and safety, and protection of government property in their decisions. DOE Order 5482.1B. The order further

states that the "quality, frequency, and depth of appraisals" for any activity on a facility depended upon "the hazard attendant with [that] activit[y]". *Id.*

Second, our review of the record shows that DOE employees in fact based their inspection decisions on policy considerations. Decisions concerning compliance appraisals were in part shaped by the resources available to DOE. *Cf. Kiehn*, 984 F.2d at 1107 (holding that a decision by National Park Service based in part on the agency's limited personnel and resources was a judgment based on social, economic, or political policy). DOE employees were forced to determine how to utilize their limited resources to best advance DOE's interest in safety. They also considered whether a particular facility or operation presented a particularly high hazard and whether the facility or operation had a history of incidents raising safety concerns.

Finally, we reiterate that, under the contract between DOE and Sandia, Sandia was primarily responsible for safety at SNL. Because it had only an oversight role, DOE was required to balance its concern for safety against its limited resources. Thus, DOE employees prioritized their appraisals based upon the relative overall hazard associated with each activity, as well as each activity's potential hazard to the environment, to the public, to the workers, and to government property.

In sum, "[n]othing in the record rebuts the presumption that under circumstances such as this, the government's actions and decisions were grounded in policy." *Kiehn*, 984 F.2d at 1108 n. 12 (citing *Gaubert*, 499 U.S. at 324–25, 111 S.Ct. at 1274–75).

## Conclusion

The United States retains its sovereign immunity here because the discretionary function exception to the FTCA applies. The DOE employees had discretion in how they implemented their tasks, and their decisions were based on policy considerations. We therefore **AFFIRM** the judgment of the district court.

HENRY, Circuit Judge, concurring.

Although the court's opinion and reasoning convince me that the government employees in this case made policy decisions they were authorized to make, I write to underscore my position that insufficient government resources alone do not a discretionary function make. I also think that a tension exists in our cases and that the confusion in this area of the law needs to be acknowledged and confronted.

The Federal Tort Claims Act was a response to a growing revelation that the king and his agents could clearly do wrong. *See, e.g.,* Edwin M. Borchard, *Governmental Responsibility in Tort,* 36 Yale L.J. 1, 39–40 (1926) ("It is not open to doubt that notwithstanding the denial by numerous courts that the maxim, 'the king can do no wrong,' has any application to the United States, it has nevertheless furnished the real explanation why exemption of the government, state and federal, from liability in tort has become an apparent axiom of American law."); *Gray v. Bell,* 712 F.2d 490, 509–11 (D.C.Cir.1983) (reviewing early twentieth century scholarship regarding government responsibility for torts), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).

Perhaps because sovereign immunity is inconsistent with American political institutions, the discretionary function cases remain difficult to classify and reconcile. In my view, two distinct lines of cases reach basically opposite results regarding the application of the discretionary function.

The first line of cases takes a less critical approach to evaluating government decision-making regarding safety issues. One could read these cases to suggest that the discretionary function exception applies if a government official could make almost any choice or exercise almost any discretion in a matter that involves limited resources.

In *Kiehn v. United States,* 984 F.2d 1100 (10th Cir.1993), for example, the plaintiff alleged that the United States was negligent in its rescue operations at a national park. We held that the discretionary function exception protected the government because National Park Service decisions regarding the rescue

"were probably based upon consideration of such factors as limited personnel and resources, difficulty in communicating with the accident site, lack of knowledge on the specifics of the accident, the remoteness of the accident site and numerous other potential factors." *Id.* at 1107. Although I do not want to oversimplify *Kiehn*'s nuanced analysis, our speculation about limited resources could be read to support a low standard for the discretionary function exception. After all, the government must always make hard choices about limited resources. The Fourth Circuit also emphasized the importance of financial considerations to government decision-making by holding that the discretionary function exception protected the government from liability when it hired an independent contractor to provide custodial services. *Williams v. United States,* 50 F.3d 299, 309–10 (4th Cir.1995).

The Eighth Circuit similarly emphasized the importance of scarce government resources in applying the discretionary function exception in *Kirchmann v. United States,* 8 F.3d 1273 (8th Cir.1993). In *Kirchmann,* a Nebraska farmer alleged that the Air Force had negligently contaminated his groundwater while constructing an Atlas missile site. Although clearly sympathetic to the harshness of the result, the Eighth Circuit held that the economic issues surrounding construction implicated the discretionary function exception. Specifically, the *Kirchmann* court noted that the plaintiff had failed to refute the government argument that it:

> had to balance the necessity of completing the construction quickly in support of the national defense, using only 100 Air Force employees, against the desirability of supervising closely the day-to-day operations of the contractors and their 3,500 employees, which would have required more Air Force personnel, more time, and more money.

*Id.* at 1277.

The second line of cases takes a decidedly narrower approach to the discretionary function, explicitly balancing economic and other social concerns with safety issues. In *Smith v. United States,* 546 F.2d 872 (10th Cir. 1976), the government argued that the discretionary function exception protected it from liability for failing to warn visitors at a national park because the government simply had made a decision to conserve the scenery. Judge Holloway, writing for the court, rejected that argument, reasoning that "[i]f we were to accept the Government's interpretation of the discretionary exception, it is difficult to perceive which duties under tort law could not be avoided by a similar policy decision to ignore them." *Id.* at 877. We have also held that the failure to post a sign at a national park does not implicate the discretionary function exception, *see Boyd v. United States,* 881 F.2d 895, 898 (10th Cir. 1989), even though such decisions will inevitably implicate financial issues.

The Ninth Circuit reached a similar conclusion in *Routh v. United States,* 941 F.2d 853 (9th Cir.1991). In *Routh,* the plaintiff was injured when a tree fell on him while he was operating heavy equipment for a government contractor. As in *Smith* and *Boyd,* the *Routh* court rejected the general government argument that basic safety issues implicate important economic or social issues and that the discretionary function exception applied in that instance. *Id.* at 856–57. Significantly, the *Routh* court rejected the government's proposal to balance safety and economic issues in a cost-benefit analysis. *Id.* at 856 n. 3. Instead, the Ninth Circuit closely examined who would bear the costs of improved safety and explicitly balanced the government's interest in avoiding delay with safety issues. *Id.* at 856–57.

In my view, *Kiehn, Williams, Kirchmann,* are inconsistent, at least in tone, with *Smith, Boyd,* and *Routh.* While the former line of cases emphasizes the virtually controlling importance of scarce resources, the latter line of cases stands for the proposition that government entities may not escape liability simply by waiving the flag of limited economic resources. By declining to apply the discretionary function exception to instances where the government has not posted a sign or not adequately supervised safety, the latter line of cases recognizes that most government decisions involve tradeoffs and suggests that the economic consequences of a particular government decision do not inevitably implicate the discretionary function. Although it would be difficult to reconcile these cases on

the facts, I believe that one factor merits special consideration in preventing the discretionary function exception from swallowing the Federal Tort Claims Act. Further, I believe that a recent trend in Constitutional analysis suggests that Congress and the courts may need to reconsider the polices and presumptions of federal government tort law.

First, I believe that courts should take care to determine that a government employee has the authority to make a particular decision before the discretionary function exception applies. In *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court made a distinction between decisions made at "planning" and "operational" levels. *Id.* at 42, 73 S.Ct. at 971. Although ostensibly abandoned in *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), Justice Scalia and a distinguished commentator continue to apply the planning/operations analysis in some form. In his concurring opinion in *Gaubert*, Justice Scalia emphasized that whether the government employee had the authority to make the decision at issue is an important question:

> Ordinarily, an employee working at the operational level is not responsible for policy decisions, even though policy decisions may be highly relevant to his actions. The dock foreman's decision to store bags of fertilizer in a highly compact fashion is not protected by this exception because, even if he carefully calculated considerations of cost to the Government vs. safety, it was not his responsibility to ponder such things; the Secretary of Agriculture's decision to the same effect *is* protected, because weighing those considerations is his task.

*Id.* at 335–36, 111 S.Ct. at 1280 (Scalia, J., concurring) (emphasis in original). Justice Scalia further suggested that the presumption that government actions are based upon policy be adjusted based upon the position of the decision-maker. *Id.* at 337, 111 S.Ct. at 1281. In addition, a commentator has suggested that it continues to be important to distinguish between "those 'who make law or governmental policy and those who do not.'"

Erwin Chemerinsky, *Federal Jurisdiction* § 9.2, at 557 (2d ed.1994) (quoting 5 Kenneth Culp Davis, *Administrative Law Treatise* 73 (2d ed.1984)).

I think Justice Scalia's approach suggests a helpful qualification upon the discretionary function exception; we must await further exposition by the Supreme Court to see if his concurrence reflects the Court's view. But it seems that unless courts routinely inquire as to whether government employees have the authority to make the sorts of decisions that result in injuring people, the fact that it is reasonable to view most government decisions as having economic implications could eviscerate the Federal Tort Claims Act. As Justice Scalia's example suggests, a nonmanagerial employee who, away from the quiet and measured reflection of a budget meeting, decides to compromise safety in order to save government resources may simply be trying to make his or her job easier rather than trying to serve the common good. When a government employee acts in such a manner, Justice Scalia's argument persuasively suggests that the government should not be entitled to invoke the discretionary function exception to avoid compensating the victims of its actions.

Second, I believe that another factor should bear upon government tort liability. Recent jurisprudential debates suggest that a government tort can constitute a taking. The Supreme Court, some members of Congress, and some citizens seem very concerned with assuring that citizens deprived of their property by Government action be adequately compensated. *See, e.g., Dolan v. City of Tigard,* —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (holding that land regulation amounted to a taking); S. 135, 104th Cong., 1st Sess. (1995) (Property Rights Litigation Relief Act); Keith Schneider, *Fighting to Keep U.S. Rules From Devaluing Land,* N.Y. Times, January 9, 1995, at A1.[1] One need look no further than *Kirchmann*, where the government contaminated the Nebraska farmer's groundwater while building a missile site, for a good example of a taking by tort. From a damages standpoint, it is certainly possible that the government action in *Kirchmann* that destroyed

---

**1.** Takings jurisprudence underscores rightful concerns about government actions. *See* Rich-

ard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* (1985). However, I

the current use of land is a much more serious devaluation than the development regulations in *Dolan* that related to future development.[2]

Interestingly, some scholars now conceptualize government takings as accidents to which they apply economic/insurance analysis and consider who is best able to absorb or distribute the loss. *See, e.g.,* Eric Kades, *Avoiding Takings "Accidents," A Tort Perspective On Takings Law,* 28 U.Rich.L.Rev. 1235 (1994); Saul Levmore, *Takings, Torts, and Special Interests,* 77 Va.L.Rev. 1333 (1991). I believe that the analogy to tort may be closer than these commentators suggest and that their economic analysis should apply to personal injury as well as real property cases.

do not share Professor Epstein's hopes for hermeneutically reshaping the Constitution through the Takings Clause. For a critical view of the Epstein approach, see Bernard Schwartz, *Main Currents in Legal Thought* 576 (1993) ("Epstein's approach is perhaps the most farreaching in contemporary jurisprudence. It would make for a seismic change that would completely transform the relations between public power and property rights.... Epstein sees the Takings Clause as the true center of the legal universe.").

2. *Gaubert*'s declaration that government employees are presumed to act based upon policy grounds when they exercise discretion and that they are therefore excused from otherwise tortious conduct, *Gaubert,* 499 U.S. at 324–25, 111 S.Ct. at 1274–75, seems inconsistent with the relaxing of the presumption that government business regulations are constitutional in the Fifth Amendment takings context. *See Dolan,* —— U.S. at ——, 114 S.Ct. at 2325 (Stevens, J., dissenting); *id.* at ——, 114 S.Ct. at 2320 (discussing Justice Stevens's concerns regarding presumptions).

