**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 15 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

BOBBY BELL, KATHLEEN BELL,
and SUNWEST BANK OF
ALBUQUERQUE, N.A., as
Conservator of the Estate of JOSEPH
BELL, a minor,

    Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellee.

No. 96-2107

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-94-709-LH)**

---

Janet K. Santillanes (James T. Roach and Nancy L. Garner with her on the briefs),
Albuquerque, New Mexico for the Plaintiffs - Appellants.

Phyllis A. Dow, Assistant U.S. Attorney (John J. Kelly, United States Attorney,
with her on the brief), Albuquerque, New Mexico for the Defendant - Appellee.

---

Before **PORFILIO**, **McWILLIAMS** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Plaintiffs brought this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2674, for personal injuries Joseph Bell sustained while diving at Ute Reservoir. While diving at the reservoir, Bell, then fourteen years old, allegedly hit his head on a submerged dirt embankment covering a pipeline. His injury rendered him a quadriplegic. Plaintiffs allege that Bell was injured by the negligence of the Department of Interior's Bureau of Reclamation (the "Bureau"), which had provided engineering services to the state of New Mexico for an expansion of the reservoir. Finding that defendant's actions fell within the discretionary function exception to the FTCA, the district court granted defendant's motion to dismiss for lack of subject matter jurisdiction. We reverse.

**I**

Ute Reservoir is owned and operated by New Mexico. In the early 1980s Ute Dam was modified to increase the volume of water in the reservoir. The Bureau entered into a contract with the New Mexico Interstate Stream Commission (the "Commission") to provide the necessary engineering services. Specifically, the Bureau agreed to "prepare designs, technical specifications and engineering estimates necessary for the installation of spillway gates on Ute Dam and to furnish engineering services to the Commission, including technical advice, engineering examinations, inspection and field supervision of construction, and foundation investigation, as necessary." Appellants' App. at 15.

Both parties agreed in an amended contract that instead of preparing designs and technical specifications for the spillway gates as called for in the original contract, the Bureau should carry out similar work for a labyrinth spillway and raised earth embankment. Id. at 37. Pursuant to its contractual obligations, the Bureau subsequently submitted to the Commission a detailed set of specifications for the labyrinth spillway and earth embankment. See id. at 41. Incorporating specifications for these projects, the Bureau then prepared contract documents between the Commission and KNC, Inc., the Commission's chosen general contractor. The Bureau was not a party to the agreement between the Commission and KNC, but by the terms of its contract with the Commission, the Bureau was to "administer" the Commission-KNC contract. See id. at 33, 48.

Under its contract with the Commission, KNC was to modify the dam in "strict accordance" with the Bureau's specifications. Id. at 48. Consistent with the Bureau's duty to supervise construction of the labyrinth spillway and raised dirt embankment, id. at 33-34, 37, KNC's contract contemplated that the Bureau, through its designated project construction engineer, would oversee the general contractor's work so as to ensure compliance with the listed specifications. See id. at 29, 69.[1]

_____

[1]As explained by one of the Bureau's design engineers, the project construction engineer's job is to ensure that the project is constructed according to the designer's specifications. Appellants' App. at 108-09.

The specifications contain certain provisions regarding a pipeline running through the dam into an "impervious borrow area," a location from which fill material was to be taken for the purpose of raising the height of the dam. Id. at 30, 43, 199. Bureau personnel were apparently aware that the borrow area would likely be submerged eventually. Id. at 199. The KNC-Commission contract required the contractor to keep the pipeline in service during construction. Id. at 43. Upon proper notice, however, the contractor could shut the pipeline down for up to two weeks. Id. In fact, KNC would have to shut down the pipeline during construction because the Bureau's engineering specifications required the contractor to relocate the pipeline—either temporarily or permanently—during excavation of the borrow area.

> To facilitate excavation in the impervious borrow area at the locations designated by the Engineer, the Contractor shall either temporarily relocate the water pipeline during excavation in the impervious borrow area and replace the water pipeline in the same location following the excavation as approved by the Engineer; or the Contractor shall permanently relocate the water pipeline with like kind around the perimeter of the impervious borrow area at a location as approved by the Engineer.

Id. at 43-44.

During construction, however, the project engineer allowed KNC to leave the pipeline in place. As a result, excavation on both sides of the pipeline created a bench approximately fifteen to twenty feet wide and rising some four to eight feet above the bottom of the borrow pit. See id. at 97. The pit and bench were

- 4 -

eventually submerged, the top of the bench lying just fifteen to thirty inches below the surface of the reservoir.  See id. at 97-98.

Plaintiffs allege that the Bureau negligently failed to ensure that the work on Ute Reservoir was done according to the Bureau's specifications, as contained in the KNC-Commission contract.  Specifically, they assert that the Bureau's construction engineer, Donald Barron, was negligent in failing to follow the Bureau's design specifications as they related to the pipeline.

In response to plaintiffs' complaint, the United States moved to dismiss for lack of subject matter jurisdiction arguing that the decision not to relocate the pipeline was discretionary and thereby protected from liability under the discretionary function exception to the FTCA.  See 28 U.S.C. § 2680(a).  The district court agreed that the Bureau's actions fell within the scope of this exception, and consequently granted the government's motion to dismiss.

## II

As a preliminary matter, we consider the procedural posture of this case. "As a general rule, a 12(b)(1) motion to dismiss cannot be converted into a motion for summary judgment under Rule 56." Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir. 1987).  However, a well-recognized exception to this rule requires the conversion of a Rule 12(b)(1) motion to a Rule 56 or 12(b)(6) motion "[i]f the jurisdictional question is intertwined with the merits of the [plaintiff's]

case." Id. "[T]he determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues." Redmon v. United States, 934 F.2d 1151, 1155 (10th Cir. 1991). Exercising our plenary power, we treat the government's motion to dismiss as a Rule 56 motion for summary judgment. See Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997); Redmon, 934 F.2d at 1155.

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence in the light most favorable to the nonmoving party. Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). The substantive law at issue determines which facts are material in a given case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

The governing law in this case, the FTCA, provides a limited waiver of the federal government's sovereign immunity. The FTCA allows civil claims against the United States for injuries

> caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). However, the FTCA preserves the government's immunity against claims based on its performance of discretionary functions:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>     (a) Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empressa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). Where the governmental conduct at issue falls within the discretionary function exception, the district court lacks subject matter jurisdiction to hear the suit. Tippett, 108 F.3d at 1196.

Whether the exception applies "presents a threshold jurisdictional determination which we review de novo," United States v. Domme, 61 F.3d 787, 789 (10th Cir. 1995), using a two-part test announced in Berkovitz v. United States, 486 U.S. 531 (1988). First, we determine whether the governmental conduct at issue "is a matter of choice for the acting employee." Id. at 536. "[C]onduct cannot be discretionary unless it involves an element of judgment or choice. Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an

employee to follow." Id. (citation omitted).  In such a situation, "the employee has no rightful option but to adhere to the directive." Id.

If the conduct at issue involves an element of judgment or choice, Berkovitz requires us to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Id.  Congress preserved governmental immunity for discretionary functions to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 536-37.  Therefore, the exception "protects only governmental actions and decisions based on considerations of public policy." Id. at 537.

In this case, plaintiffs do not claim there is a statute, regulation or agency policy requiring the Bureau to relocate the pipeline.  Instead, plaintiffs assert such a duty was assumed by the Bureau when it agreed with New Mexico to supervise the project's compliance with the specifications the Bureau had itself prepared. In effect, plaintiffs contend that the Bureau was contractually obligated to ensure that KNC moved the pipeline from the borrow area, and thus that the government lacked discretion to leave the bench in its final and hazardous location.

Courts have recognized that the government's voluntarily assumed contractual obligations can impose nondiscretionary duties on government employees.  See, e.g., Kiehn v. United States, 984 F.2d 1100, 1106 (10th Cir.

1993) (mandatory emergency assistance required by contract and National Park Service guidelines); Routh v. United States, 941 F.2d 853, 855 (9th Cir. 1991) ("[D]iscretion may be removed if the government incorporates specific safety standards in a contract which imposes duties on the government's agent." (internal quotation omitted)); Feyers v. United States, 749 F.2d 1222, 1227 n.7 (6th Cir. 1984) (considering whether contract required specific safety measures). The question, therefore, is whether the government contractually assumed a duty to ensure removal of the pipeline.

The district court determined that it did not. Reviewing the specifications prepared by the Bureau and incorporated into the KNC-Commission contract, it held that Mr. Barron, the project construction engineer, retained discretion not to move the pipeline if he determined that excavation of the borrow area could be accomplished without removal. Absent an ambiguity, we review the district court's interpretation of the contract and specifications de novo, see Milk 'N' More, Inc. v. Beavert, 963 F.2d 1342, 1345 (10th Cir. 1992), applying federal law, see Howard v. Group Hosp. Serv., 739 F.2d 1508, 1510-11 (10th Cir. 1984) (where outcome of suit has direct effect on United States, federal law controls interpretation of contract). Under that standard, we cannot agree with the district court that Mr. Barron had discretion not to remove the pipeline.

It is true, as the district court noted, that the specifications gave the project construction engineer considerable discretion to determine the location and extent of excavation within the borrow pit.[2]  However, the specifications presumed that the pipeline would have to be removed, at least temporarily, to facilitate excavation.  In the event the pipeline were to be replaced in its original location, the specifications required it to be buried in a trench.  Appellants' App. at 44.  Moreover, the specifications separately detailed the condition in which borrow areas were to be left.  "Borrow pits shall be operated and left in a condition so as not to impair the usefulness nor mar the appearance of any part of the work or any other property of the owner . . . .  The surfaces . . . shall be left in a reasonably smooth and even condition."  Id. at 46.  Leaving a bench area that rose between four and eight feet off the bottom of the borrow pit to within a few inches of the surface of the final water level clearly violated these prescriptions.[3]  The surfaces

[2]The record shows that Mr. Barron initially thought it would be unnecessary to excavate on both sides of the pipeline because the contractor could obtain enough fill material from excavation on the south side of the pipeline.  Appellants' App. at 127.  When there was not enough fill material, however, Mr. Barron directed excavation on the north side of the pipeline.  Id. at 127-28.  Mr. Barron decided not to relocate the pipeline.  Id. at 128.  Years later, when deposed during this lawsuit, he could not remember the exact basis for that decision.  Id.

[3]If Mr. Barron had any doubt as to what the specifications required, he could have consulted the "construction considerations" drafted by the Bureau design engineers to serve as a "guideline document for field personnel to have an understanding why certain features were designed the way they were."  Appellants' App. at 106.  The construction considerations reiterated the requirement that the pipeline be relocated during excavation of the borrow area.  Id. at 118.  Further, one "important reason" for this requirement was

of the borrow pit were not left smooth and even, and the pit was manifestly left in a condition that would (and demonstrably did) impair the recreational usefulness of the reservoir.[4]

Because the specifications, read as a whole, prohibited Mr. Barron from leaving the raised bench in the borrow area, "there is no discretion . . . for the discretionary function exception to protect," Berkovitz, 486 U.S. at 536. Hence the district court erred in dismissing this case under the discretionary function exception.[5]

**REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

---

that "[t]he creation of a bench of borrow area material supporting the pipeline is . . . undesirable." Id.

[4]The record shows that Bureau design engineers were well aware of the recreational uses of Ute Reservoir. See Appellants' App. at 123, 157.

[5]Had the government agent been accorded discretion, we would then "presume[] that [his] acts [were] grounded in policy when exercising that discretion." United States v. Gaubert, 499 U.S. 315, 324 (1991). Of course, not all discretionary decisions are policy decisions. The presumption that a discretionary decision is grounded in policy can be overcome by allegations that "support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Id. at 324-25; see also United States v. Domme, 61 F.3d 787, 793 (10th Cir. 1995) (examining record to determine whether decision was based on policy considerations). In this case, because the relevant specifications left Mr. Barron no discretion to leave a bench in the borrow area, we need not decide whether his decision to do so was "not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Gaubert, 499 U.S. at 324-25.