FILED
United States Court of Appeals
Tenth Circuit

April 22, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

BRIAN SYDNES and TOM
LaBRECQUE,

      Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

      Defendant-Appellee.

No. 07-1288

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 05-cv-00642-REB-MJW)

---

Timothy M. Kratz, Pendleton, Friedberg, Wilson, & Hennessey, P.C., Denver,
Colorado, for Plaintiffs-Appellants.

Paul Farley, Assistant United States Attorney (Troy A. Eid, United States
Attorney, with him on the brief), Denver, Colorado, for Defendant-Appellee.

---

Before **BRISCOE** and **GORSUCH,** Circuit Judges, and **PARKER**,[*] District
Judge.

---

**GORSUCH**, Circuit Judge.

---

    [*] Honorable James A. Parker, United States District Court Judge for the
District of New Mexico, sitting by designation.

Titan Corporation fired Brian Sydnes and Tom LaBrecque, civilian contractors employed by Titan to work as video-teleconferencing engineers at, and under the supervision of, the United States Northern Command. Claiming they had been wrongfully terminated in retaliation for reporting security breaches to Northern Command, Mr. Sydnes and Mr. LaBrecque brought a variety of tort claims against the United States and Titan. While Titan eventually settled, the district court granted summary judgment in favor of the United States, holding that the discretionary function exception to the Federal Torts Claims Act left it without authority to hear plaintiffs' claims. Because we agree that employment decisions such as the one at issue here are not matters for which the United States has waived sovereign immunity, we affirm.

I

A

Viewing, as we must, the evidence in the light most favorable to the plaintiffs as the parties responding to a summary judgment motion, the facts before us are these. Titan Corporation had a contract to provide certain technical support services to the United States Northern Command ("NORTHCOM"), and hired Mr. Sydnes and Mr. LaBrecque to participate in the project. The pair were assigned to work at the Joint Communications Support Center ("JSCS") at NORTHCOM. Although employees of Titan, Mr. Sydnes and Mr. LaBrecque

worked in a building occupied and operated by NORTHCOM, and received their daily instructions from Air Force personnel at JSCS.

On March 14 and 28, 2004, Mr. Sydnes observed Sergeant Deborah Helle of the United States Air Force provide an operational cryptograph key to John Moody, a civilian who was not authorized to be in possession of such classified material. On the latter occasion, Mr. Sydnes approached Mr. Moody and questioned him about his possession of the key. Mr. Moody conceded that he lacked any training regarding proper handling of the key and indicated that Sgt. Helle had provided it to him. Mr. Moody turned the key over to Mr. Sydnes, who returned it to proper officials.

Troubled by what appeared to him to be a security breach, Mr. Sydnes consulted with Mr. LaBrecque and another support engineer, Steve Hettler. Mr. Sydnes and Mr. LaBrecque then reviewed Air Force regulations and determined the matter should be reported. On March 31, Mr. Sydnes verbally reported his observations to Staff Sergeant Roy James. A day later, April 1, 2004, Mr. Sydnes reported the incident to his superior at Titan, Gary Martinez, and two military officers at NORTHCOM responsible for communications security.

Less than two hours after Mr. Sydnes spoke with Titan and military officials on April 1, Mr. Martinez and Lieutenant Colonel Randy McCanne, the commander of the JSCS, confronted Mr. Sydnes and Mr. LaBrecque. Lt. Col. McCanne was apparently upset that the violation had not been reported to him

- 3 -

directly, and angrily told Mr. Sydnes and Mr. LaBrecque that he was "trying to build a team" that their actions were "tearing . . . apart." Lt. Col. McCanne also indicated that Sgt. Helle, who shared work space with Mr. Sydnes, "needed a cooling off period" and had requested that Mr. Sydnes remove his belongings from her work area, a request Lt. Col. McCanne instructed Mr. Sydnes to comply with.

For the next week, Mr. Sydnes shared a computer and cubicle space with Mr. LaBrecque, and on April 7 both were fired. Although Titan told them their dismissal was a result of NORTHCOM's decision to reduce funding for their positions, in the weeks and months that followed Titan began recruiting engineers to work on video-teleconferencing issues at NORTHCOM, and indeed filled the same number of positions that existed prior to the dismissal of Mr. Sydnes and Mr. LaBrecque.

B

Mr. Sydnes and Mr. LaBrecque filed suit against Titan and the United States, claiming they were fired in retaliation for reporting the alleged security breaches. They asserted claims against Titan for wrongful discharge in violation of public policy and "extreme and outrageous" conduct,[1] and against the United States for wrongful discharge in violation of public policy, "extreme and

---

[1] In Colorado, a claim for extreme and outrageous conduct is the same as a claim for intentional infliction of emotional distress. *English v. Griffin*, 99 P.3d 90, 93 (Colo. Ct. App. 2004).

outrageous" conduct, and civil conspiracy. Both defendants moved for summary judgment. The district court granted Titan's motion as to the "extreme and outrageous" conduct claim, but denied Titan's motion with respect to the wrongful discharge claim. Titan subsequently settled and is no longer a party to this action. For its part, the United States argued in its motion for summary judgment that sovereign immunity barred plaintiffs' claims. The district court agreed, granted the United States' motion for summary judgment, and entered judgment.

## II

Because the sovereign may not be sued without its consent, plaintiffs cannot proceed without establishing that the United States has agreed to answer to their claims in court. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). As a question of law, we review *de novo* the district court's determination that such consent is lacking, and do so bearing in mind that the party asserting jurisdiction bears the burden of proving that sovereign immunity has been waived. *James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992).

The FTCA lists many types of claims for which the United States has consented to be sued. Included among these are claims for certain injuries caused by government employees acting within the scope of their employment. 28 U.S.C. § 1346(b). But the FTCA's waiver in this field is subject to (many) exceptions, and what the sovereign giveth it may also take away. Most relevant

for our purposes is the discretionary function exception, which reasserts the government's immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).[2]

In *Berkovitz v. United States*, 486 U.S. 531 (1988), the Supreme Court announced a two-part test for determining whether a challenged action falls within the scope of the discretionary function exception.  At the first stage, a court must "consider whether the action is a matter of choice for the acting employee."  *Id*. at 536.  If the action does involve such choice, we must then consider whether the type of action at issue is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).  If both of these conditions are met, the discretionary function exception applies and sovereign immunity doctrine precludes suit.  If, however, plaintiffs can show that *either* prong is not met, then the exception does not apply and a claim may proceed.

In order to apply this framework, we must first pause to ask exactly what conduct plaintiffs challenge.  Despite the fact that plaintiffs were employed by Titan, plaintiffs assert that military officials retained sufficient control over plaintiffs' day-to-day activities and Titan's hiring decisions that, effectively, the

---

[2]  Because we agree that the discretionary function exception applies, we do not reach the government's alternative argument that jurisdiction is barred by the FTCA's exception for claims involving interference with contract rights.

United States either terminated plaintiffs or exercised its influence over Titan to have them terminated. Plaintiffs' complaint therefore identifies the challenged conduct as "unlawfully conspiring to orchestrate plaintiffs' wrongful termination," Compl. ¶ 47, or the "wrongful termination" itself, *id*. ¶ 54. The United States does not contest that such a claim could conceivably fall within the ambit of Section 1346(b)'s waiver, but argues instead that, under the circumstances of this case, the discretionary function exception applies.[3]

A

Turning to *Berkovitz*'s first prong, plaintiffs contend that the government's alleged decision to have them terminated was not an action that involved any element of choice. Importantly, plaintiffs do not dispute that employment decisions generally involve a significant degree of discretion by personnel supervisors. Instead, they argue, certain motivations for firing employees are, as a matter of law, categorically impermissible, and thus not a matter of discretion. More specifically, they argue that NORTHCOM's discretion to have them terminated was, in this case, constrained by two sources of law: Colorado

---

[3] The United States does argue that if the district court had found that plaintiffs actually were federal employees, rather than employees of Titan over whom the United States exercised some indicia of control, plaintiffs' sole recourse would be through the Civil Service Reform Act. However, on appeal plaintiffs do not contest the district court's treatment of their employment status, and so we have no occasion to address this alternative argument.

common law and government regulations governing the reporting of security breaches.

1. Plaintiffs' common law argument follows this syllogistic path: Colorado common law proscribes the firing of an at-will employee for any reason that violates public policy, and government regulations dealing with the handling of classified information establish a public policy of protecting classified information. Therefore, NORTHCOM's discretion to fire Mr. Sydnes and Mr. LaBrecque in retaliation for reporting the alleged security violation was circumscribed by Colorado common law.[4]

Plaintiffs put the cart before the horse. They would have us assume that the United States fired them in violation of Colorado common law, and on that basis decide that the district court has jurisdiction to hear whether the United States really did fire them in violation of Colorado common law. But we reach the question whether the federal government is liable for breaching some duty of care under state law if (and only if) we can first find an applicable waiver of sovereign immunity by the federal government itself. *Domme v. United States*, 61 F.3d 787, 789 (10th Cir. 1995). To overcome the discretionary function exception and thus have a chance of establishing a waiver of sovereign immunity, plaintiffs must

---

[4] Indeed, in the context of the suit against Titan, the district court found that the regulations dealing with classified information provided a legally sufficient basis under Colorado law to support a wrongful discharge in violation of public policy claim. R. at 258. Of course, as a private entity Titan could not invoke sovereign immunity to challenge the district court's jurisdiction.

show that the federal employee's discretion was limited by "a *federal* statute, regulation, or policy," *Berkovitz*, 486 U.S. at 536 (emphasis added); after all, states can't waive the federal government's immunity. Considering state tort law as a limit on the federal government's discretion at the jurisdictional stage impermissibly conflates the merits of plaintiffs' claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in the first place. Indeed, the only conceivable way plaintiffs might succeed on their theory is by pointing to a *federal* policy incorporating state tort law as a limit on the discretion of federal employees with the meaning of the FTCA. And this plaintiffs have not done.

2. Plaintiffs' alternative theory does point to federal regulations and policies, but is ultimately no more availing. Plaintiffs direct us to various rules regarding the handling of classified information and security breaches; most pertinent for our purposes, these regulations prohibit retribution by government officials against individuals who challenge the decision to classify (or declassify) information, and emphasize the need to report security breaches promptly.[5] The problem with plaintiffs' argument is that they didn't challenge any classification decision, and the regulations emphasizing the need to report security breaches do not purport to preclude retribution by officials who receive such news. Simply

---

[5] Specifically, plaintiffs point us to Air Force Instruction 33-211 and Department of Defense Directive 5200.1, which implement Executive Order 13292, 68 Fed. Reg. 15315.

put, even assuming that plaintiffs were fired in retaliation for reporting the security breaches, their actions are not protected from retribution by the regulations to which they point.

One can make a reasonable argument that officials should no more be allowed to engage in retribution against those who report security breaches than those who challenge classification decisions. But this is a decision for the elected branches, and we are no more free to write their statutes and regulations for them than they are free to write our decisions for us. And given the apparent lack of constraining regulations in federal law identified by plaintiffs, we can only conclude that staffing decisions related to the hiring and firing of civilian contractors at JSCS were left to the discretion of NORTHCOM officials. Of course, there is also the possibility that such a regulation might exist in the copious directives of the Department of Defense and plaintiffs have, despite their admirable diligence in pursuing this case, just missed it. But the burden under our case law to present evidence of a discretion-constraining regulation or policy resides with the plaintiffs. *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998) ("The discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction.") (internal quotations omitted); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992) (holding plaintiffs must cite specific regulations the government is alleged to have violated). We have

examined the two theories under which they have proceeded, and neither

succeeds.  More than that, we cannot say.

B

Even though they fail under *Berkovitz*'s first prong, plaintiffs may still

overcome the discretionary function exception by demonstrating, pursuant to

*Berkovitz*'s second prong, that "the nature of the actions taken" does not

"implicate public policy concerns, or [is not] 'susceptible to policy analysis.'"

*Harrell v. United States*, 443 F.3d 1231, 1236 (10th Cir. 2006).  Plaintiffs argue

that they meet this test because their firings were not the product of any

legitimate public policy concern; they emphasize that the only contemporaneous

reason the government cited for their dismissal was that their positions were

defunded – and this explanation, they contend, was obviously pretextual given the

rapidity with which their positions were refunded and filled.

Plaintiffs' argument, reasonable though it sounds on the merits,

misapprehends the nature of our sovereign immunity inquiry under *Berkovitz*.

Consistent with Congress's instruction that the discretionary function exception

applies even when "the discretion involved be abused," 28 U.S.C. 2680(a), we

may entertain a claim only when the plaintiff can demonstrate that the

"challenged actions are not *the kind of conduct* that can be said to be grounded in

the policy of the regulatory regime," *Gaubert*, 499 U.S. at 325 (emphasis added).

That is, we do not inquire into the intent of the government supervisor when

making a specific personnel decision, *Harrell*, 443 F.3d. at 1235, and neither do we ask "whether policy analysis is the *actual* reason for the decision in question," *Duke v. Dept. of Agric.*, 131 F.3d 1407, 1413 (10th Cir. 1997) (Briscoe, J., concurring in part and dissenting in part) (emphasis added). Instead, we operate at a higher level of generality than plaintiffs argue for, asking categorically (rather than case specifically) whether the kind of conduct at issue can be based on policy concerns.

We have previously and unqualifiedly held that "[d]ecisions regarding employment and termination" – the kind of conduct at issue here – are "precisely the types of administrative action the discretionary function exception seeks to shield." *Richman v. Straley*, 48 F.3d 1139, 1146-47 (10th Cir. 1995). We see no way to escape the gravity of this precedent in the disposition of this case. Whatever may've occurred in the specifics of plaintiffs' situation, employment and termination decisions are, as a class, the kind of matters requiring consideration of a wide range of policy factors, including "budgetary constraints, public perception, economic conditions, individual backgrounds, office diversity, experience and employer intuition." *Burkhart v. Washington Metro Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997); *see also Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995). Choosing how to evaluate these various policy considerations, determining which to give more weight to, and ultimately deciding whether a particular individual with a certain skill-set and temperament

will help an agency fulfill its mission all involve sensitive policy judgments, and an employer or supervisor must decide which blend of skills will best aid the agency in performing its legally-prescribed duties. Forcing the government, at the jurisdictional stage, to defend its rationale for its employment decision in particular cases would, moreover, eviscerate the benefits of sovereign immunity that Congress has chosen to retain in discretionary function cases, and essentially enmesh us in a mini-trial about the merits. As we have said in the context of state sovereign immunity, "immunity entitles a [sovereign] not only to protection from liability, but also from suit, including the burden of discovery." *Univ. of Texas v. Vratil*, 96 F.3d 1337, 1340 (10th Cir. 1996).

The two cases plaintiffs primarily depend upon in arguing for a contrary result dictate no such thing. In *O'Toole v. United States*, 295 F.3d 1029 (9th Cir 2002), and *ARA Leisure Servs. v. United States*, 831 F.2d 193 (9th Cir 1987), our sister circuit rejected the government's argument that the need to allocate scarce budgetary resources alone was a sufficient policy basis to trigger the discretionary function exception. These cases, however, did not involve employment decisions, but rather were cases in which government agencies charged with maintaining in good condition certain infrastructure on government-owned land had failed to do so. In both cases, budgetary constraints were the sole policy consideration the government offered as being relevant to the kind of conduct in question, maintenance decisions. *O'Toole*, 295 F.3d at 1036; *ARA Leisure Servs.*, 831 F.2d

at 195.  Here, by contrast, the government has argued (in harmony with our holding in *Richman*) that employment decisions are of a kind that involve not only budgetary concerns, but also managerial and human resources considerations, "including the staff's capabilities and effectiveness," Gov't Br. at 14.  That such matters may be considered in making employment decisions suffices to distinguish such conduct from the "routine maintenance" decisions at issue in *O'Toole* and *ARA Leisure Services*.[6]

* * *

A federal agency's decision to terminate or request the termination of an employee involves an element of choice and is the kind of decision that implicates policy concerns relating to accomplishing the agency's mission.  The plaintiffs' suit against the United States, however strong it may be on the merits,

---

[6] Plaintiffs also point us to the Supreme Court's decision in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), a case in which the Supreme Court held that the FTCA did not bar jurisdiction in a suit against the Coast Guard for failing to maintain a lighthouse.  However, like many of our sister circuits, we have recognized post-*Gaubert* that *Indian Towing* "is simply not persuasive authority in the context of the discretionary function exception."  *Harrell*, 443 F.3d at 1237.

Even so, plaintiffs contend that, at the very least, their claim for "extreme and outrageous" conduct survives the discretionary function exception because no public policy could possibly be served by allowing a government employee to berate and "verbal[ly] abuse" employees in the manner that plaintiffs maintain Lt. Col. McCanne berated them.  Plaintiffs are, however, bound by their pleadings in this regard.  Their complaint identifies the allegedly outrageous conduct as "unlawfully conspiring to orchestrate plaintiffs' wrongful termination in violation of public policy."  Compl. ¶ 47.  Plaintiffs thus did not attempt to make out any tort claims on any basis other than their termination.

is therefore barred by the discretionary function exception to the FTCA, and the district court's judgment is

*Affirmed.*