Jose **FIGUEROA, individually and on behalf of the heirs of Rodrigo Figueroa; Rafael Figueroa, Iryana Figueroa, Paulina Figueroa, Karla Figueroa, and Jose Figueroa, Jr., Plaintiffs,**

v.

**UNITED STATES of America, and S & L Services, Inc., Defendants.**

No. 1:97–CV–003J.

United States District Court, D. Utah, Northern Division.

Feb. 5, 1999.

James R. Hasenyager, Odgen, Utah, for plaintiff.

Carlie Christensen, Assistant U.S. Attorney, Salt Lake City, Utah, Barbara K. Berrett, Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

On January 6, 1999, the above-captioned action came on for hearing on the defendants' separate motions for summary judgment. At the hearing, Carlie Christensen, Assistant United States Attorney, argued the motion on behalf of the United States and the United States Forest Service; Barbara K. Berrett argued the motion on behalf of S & L Services, Inc.; and James R. Hasenyager argued on behalf of the plaintiffs. At the close of the hearing, the court took the matter under advisement. The court, now having carefully considered the defendants' motions, the parties' supporting and opposition memoranda, and having heard argument from counsel, and for reasons discussed more fully below, hereby denies in full the motion of S & L Services and denies in part the motion of the United States.

### Background Facts

Briefly summarized, on July 25, 1994, Elizabeth Holton was fatally injured when she was struck on the head by a falling rock while visiting the Hanging Rock Picnic Area. Hanging Rock, a popular picnic location, was located in the Uinta National Forest, an area owned by the United

States and administered by the United States Forest Service.[1] When she was struck, Ms. Holton had been standing in or near the river bed of the American Fork River that runs through the picnic area. Immediately, the Forest Service closed the picnic area. It remained closed for the remainder of 1994.

In response to the fatal injury, in the early summer of 1995, the Forest Service erected a pole fence—similar to a split-rail fence—at the picnic area. The fence, more a decorative feature than a barrier, was installed to delineate what the Forest Service considered a rock fall hazard zone. The fence ran east to west through the southern tip of a grassy picnic area, stopping short of the river. Three signs were affixed to the fence which read "FALLING ROCK AREA." In addition, a fourth sign that read "CAUTION FALLING ROCKS IN THIS AREA" was placed on a bulletin board that was affixed to the outside wall of the bathroom building. In July 1995, the Forest Service reopened the picnic area.

On July 29, 1995, just a few weeks after the picnic area was reopened and almost a year to the day that Elizabeth Holton was killed, the Figueroa family visited Hanging Rock. After parking their car, the family walked toward the fence. Each member of the family climbed through the fence in order to take family pictures near the river. There were fishermen in the river and two families picnicking inside the fenced-in area. Family members gathered on a rock in the river for a photo. After the photo was taken, thirteen year-old Rodrigo Figueroa remained on the rock. While standing alone he was struck on the head by a falling rock and killed. As before, the Forest Service immediately closed the pic-

nic area. It was never reopened. The picnic area was later bulldozed over and all improvements were removed.

On May 21, 1996, the parents of Rodrigo filed an administrative claim pursuant to the Federal Tort Claims Act ("FTCA"). Subsequently, on January 7, 1997, and pursuant to the FTCA, the parents and heirs of Rodrigo filed a wrongful death action in this court seeking damages as a result of Rodrigo's death. *See* 28 U.S.C. § 1346(b). Rodrigo's siblings also filed claims to recover for the emotional distress they allegedly suffered as a result of witnessing their brother's death. The plaintiffs filed these claims against the United States and S & L Services, Inc., the private party contracted to operate the picnic area. The claims, all negligence based, include a failure to warn and a failure to adequately supervise the operations of the picnic area.

On November 10, 1998, both the United States and S & L Services filed motions for summary judgment. The focus of the United States' motion is on subject matter jurisdiction. It argues that the plaintiffs claims are barred under the "discretionary function exception" to the FTCA. *See* 28 U.S.C. § 2680(a). It argues that because the decision to close or not close the picnic site, and the decision on what types of warning signs, if any, should be placed at the site, were "discretionary" decisions based on "public policy concerns," the plaintiff's are barred from bringing this action because this court lacks subject matter jurisdiction.

The United States also asserts that Utah's "Limitation on Landowner Liability Act," Utah Code Ann. §§ 57–14–1 *et seq.*,

1. The Hanging Rock Picnic Area was one of the most popular recreational areas in the Uinta National Forest. Located just four miles from the mouth of American Fork Canyon and the nearby cities of Alpine, Highland, and American Fork, the picnic area was used by an estimated 100–150 visitors per day on weekends and 50–60 visitors per day on weekdays. (*See* Declaration of Melissa Yvonne Crumpton, at ¶¶ 3 & 5, attached as Ex. A to

United States' Mem. in Support of Mot. for Summ.J.) The picnic area was a flat area of approximately 300 feet in length and 200 feet in width. It contained a black-topped parking lot, a restroom, three concrete "pads," each of which contained several pedestal barbecue grills, several drinking fountains, and an artificial irrigation system. (*See id.* at ¶ 4; Decl. of Kim J. Martin, dated Jan. 12, 1999, at Ex. A.)

provides the United States with immunity from plaintiffs' claims. Under the Act, any landowner, including a public landowner, who opens up his land for recreational uses and who does not charge a fee is generally considered immune from liability. *See* Utah Code Ann. § 57–14–4.

Even if not immune from suit, the United States argues that it has met the reasonable care standard owed to invitees under Utah law because it put up a fence and signs warning of the rock fall danger. In addition, the United States argues that the plaintiffs claims for negligent infliction of emotional distress must fail because the administrative notice required under the FTCA did not set forth sufficient facts about this claim so that the United States could properly investigate it. It also argues that because none of the plaintiffs actually saw the rock hit Rodrigo, these claims must fail as a matter of law.

Like the United States, S & L asserts that it too is immune from suit under Utah's Limitation on Landowners Liability Act. S & L argues that as a special permittee of the Forest Service, and as the party contracted to operate the campgrounds in the Uinta National Forest, including the Hanging Rock Picnic Area, it was falls within the definition of land "owner" set forth in the Act. *See* Utah Code Ann. § 57–14–2.

S & L also argues that, as a matter of law, it had no duty to investigate, minimize, or eliminate any rock fall hazards at the picnic area because the terms of its permit with the Forest Service did not allow it to do so, nor did the permit allow S & L to erect any signs warning of the hazard. In addition, because the injury occurred in the river, an area that S & L argues is outside the scope of its special permit, S & L asserts that it had no duty whatsoever to persons who were injured in the river. And lastly, S & L argues that in any event it had no knowledge of the rock fall hazard, and that the United States' failure to disclose the hazard entitles S & L to void or rescind the special permit.

## I

Under the historic English common law maxim *"Rex non potest peccare,"* loosely translated as "the King can do no wrong," a sovereign was immune from liability. This doctrine was first noted by Chief Justice Marshall as protecting the United States from suit in *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 411–12, 5 L.Ed. 257 (1821) ("The universally received opinion is, that no suit can be commenced or prosecuted against the United States...."), and judicially recognized in *United States v. Clarke,* 33 U.S. (8 Pet.) 436, 444, 8 L.Ed. 1001 (1834) ("As the United States are not suable of common right, the party who initiates suit must bring his case within the authority of some act of congress, or the court cannot exercise jurisdiction over it."). The Supreme Court has noted that the grant of this immunity was intended to prevent litigation from interfering with public acts that are *essential* to the governing of the Nation. *See Nichols v. United States,* 74 U.S. (7 Wall.) 122, 126, 19 L.Ed. 125 (1868) (emphasis added).

In 1946, after nearly thirty years of consideration, the Federal Tort Claims Act was passed by Congress. As understood by the Supreme Court, the adoption of the FTCA was the "offspring of a feeling that the Government should assume the obligation to pay damages for the misfeasance of employees carrying out its work." *Dalehite v. United States,* 346 U.S. 15, 24–30, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (discussing the legislative history of the FTCA). In effect, the FTCA partially ameliorated traditional sovereign immunity by imposing responsibility on the United States for its negligent conduct. American citizens who were injured as a result of the negligence of the United States could now sue for damages. Before the FTCA was enacted, the only way a person could be compensated for an injury negligently caused by the United States was to have a private claim bill presented in and passed by Congress and signed into law by the President. *See id.* at 24–25 & n. 9, 73

S.Ct. 956. The FTCA avoided this clumsy (and likely partisan) approach in favor of an easier and simpler practice that gave federal district courts the power to hear claims against the United States "for money damages ... for injury ... or death caused by the negligent or wrongful act or omission of any employee of the Government." [2]  28 U.S.C. § 1346(b)(1).  Under the FTCA, the United States is made liable to the same extent that "a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  *Id.*

Despite the broad waiver of sovereign immunity reflected in the language of the FTCA, immunity still exists in some circumstances.  By virtue of the thirteen enumerated exceptions found in 28 U.S.C. § 2680, the United States still retains limited immunity for its negligent acts.  One of these exceptions, the so-called "discretionary function exception," is raised here.  Under this exception, the district court is divested of jurisdiction, and the United States effectively retains traditional sovereign immunity, if the asserted claim against the United States is:

> based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation ... or based upon the exercise or performance or the failure to exercise of perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion be abused.

28 U.S.C. § 2680(a).

If this exception applies in this case, this court is without jurisdiction to hear the plaintiffs' claims against the United States.  Thus, even if it is shown that the United States, acting through its agents, caused harm to innocent people, if the action falls within the discretionary function exception the United States cannot be brought be-

fore a court to answer for its conduct and compensate those who have been innocently injured.  This concept—rooted as it is in archaic monarchial principles—has troubled this court before, *see Allen v. United States,* 588 F.Supp. 247 (D.Utah 1984), *rev'd,* 816 F.2d 1417 (10th Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988), and must be carefully examined so that its application does not eviscerate the laudatory purposes of the FTCA.

This examination, however, is anything but straightforward.

As revealed by the case law, the discretionary function exception has traveled a serpentine path.  The case reporters are cluttered with contradictory decisions.  Cases that most would agree are factually similar often result in different applications of the discretionary function exception.  *Compare Rosebush v. United States,* 119 F.3d 438, 443 (6th Cir.1997) (concluding that Forest Service's decision not to warn of dangers of firepits falls within the discretionary function exception) *with Summers v. United States,* 905 F.2d 1212, 1215 (9th Cir.1990) (concluding that National Park Service decision not to warn of the dangers of fire rings was *not* within the exception); *see also Domme v. United States,* 61 F.3d 787, 794–95 (10th Cir.1995) (Henry, J., concurring) (recognizing the inconsistency in the case law concerning the exception); 14 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3658.1, at 640 (1998) ("Unfortunately, it is unclear what falls within the scope of [the exception], despite an immense amount of precedent that has developed on the subject."). Nevertheless, this court will endeavor to examine the exception in light of the facts of this case, the purposes of the FTCA and the exception, and as guided by relevant precedent.  *Cf. Wesreco v. United States*

---

**2.** *See Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (noting that the "broad and just" purpose of the FTCA was to compensate victims of negli-

gence and "not to leave just treatment to the caprice and legislative burden of individual private laws").

*Dep't of Interior,* 618 F.Supp. 562, 567 n. 8 (D.Utah 1985) (recognizing that the related concept of sovereign immunity has not been consistently applied, whether liberally or otherwise, and noting that in construing and applying the doctrine the court will "address some of the decisions in an attempt to resolve some of the confusion").

■ Under United States Supreme Court case law, whether the discretionary function exception should be applied is to be determined under a two-step analysis. The first step is to determine whether the decision was in fact discretionary, that is whether any "statute, regulation, or policy specifically prescribes a course of action to follow." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)); *see Duke v. Department of Agriculture,* 131 F.3d 1407, 1409 (10th Cir.1997).

■ Under the facts of this case, this first step poses no great intellectual difficulty. Although the plaintiffs argue that a Forest Service Manual specifically directed the Forest Service's course of action in reference to the rock fall hazard, this argument was recently examined by the Sixth Circuit and rejected. *See Rosebush v. United States,* 119 F.3d 438, 442 (6th Cir. 1997). The sections of the Forest Service Manual the plaintiffs cite, sections 2331.5, 2332, 2332.1 and 2332.12, which speak broadly to public safety, do not mandate any specific course of action in the face of

a rock fall hazard.[3] As the court in *Rosebush* recognized, none of these guidelines require the Forest Service act in any particular way. *See id.* The plain language of the Manual makes clear that any decisions concerning what steps to take to ensure public safety in a national forest are the responsibility of the Forest Service personnel in charge of that particular district. There are no specific guidelines that refer to rock fall hazards or that offer specific steps that should be taken to warn visitors of such a hazard. *See Duke v. Department of Agriculture,* 131 F.3d 1407, 1410 (10th Cir.1997) (concluding that there was no Forest Service regulation or policy that " 'specifically prescribe[d] a course of action' for the Forest Service employees to follow" in warning of dangerous rock fall) (quotations and citations omitted). Rather, the guidelines contained in the Forest Service Manual only require that the Forest Service identify and correct hazards "[t]o the extent practicable" and "[i]f possible." This circuit has already held that such language "is a prime example of discretionary language, which g[ives] federal agencies a choice or judgment on what action to take, *if any.*" *Aragon v. United States,* 146 F.3d 819, 824 (10th Cir.1998) (emphasis in original). Thus, the first part of the discretionary function exception is met.

Just because an action required some choice, however, does not automatically place it within the exception. There are levels of choice. ***Not all choices*** come

---

**3.** The sections of the Manual the plaintiffs rely upon read as follows:

*2331.5—Site Closure.*
5. Close the site of facility when conditions reach the point that the users' health or safety is jeopardized or unacceptable resource damage is occurring.
*2332—OPERATION AND MAINTENANCE.*
Give health-and safety-related items highest priority.
*2332.1—Public Safety.* To the extent practicable, eliminate safety hazards from recreation sites. . . .
Immediately correct high-priority hazards that develop or are identified during the operating season or close the site.

*2332.12—Other Natural Hazards. If possible,* correct known natural hazards when a site is developed and opened for public use. If it is not possible to remove the hazard, take immediate steps to protect the public from the hazard. Tailor the action taken to each hazardous situation. Post signs or other notices at a minimum. Consider installing barriers or closing the site altogether to ensure public safety.
(Forest Service Manual, FSM 2300—Recreation, Wilderness, and Related Resource Management, effective Oct. 11, 1994, at pp. 7–9).

within the exception. As the Tenth Circuit has recently noted, an approach that would allow all decisions that involve choice to come within the discretionary function exception " 'would allow the exception to swallow the FTCA's sweeping waiver of sovereign immunity.' " *Duke,* 131 F.3d at 1411 (quoting *Cope v. Scott,* 45 F.3d 445, 449 (D.C.Cir.1995)). Thus, this court's analysis does not end with its conclusion that the Forest Service had some choice in determining how to act in regard to the rock fall hazard.

Instead, the court must turn to the second step of the discretionary function exception analysis as outlined by the Supreme Court in *Berkovitz* and *Gaubert.* *See Gaubert,* 499 U.S. at 323, 111 S.Ct. 1267 (stating that "actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected") (emphasis added); *Duke,* 131 F.3d at 1410. This step asks first whether the challenged discretionary acts are of a nature and quality that Congress intended to shield from tort liability. *See Gaubert,* 499 U.S. at 332, 111 S.Ct. 1267. To fall within this class, the choice must be one that is susceptible to policy judgment and involve the exercise of "political, social, [or] economic judgment." *Id.* at 325, 111 S.Ct. 1267. Only decisions grounded in "social, economic, or political goals" fall within the protection of the exception. *Id.* at 323, 111 S.Ct. 1267. Garden variety discretion—exemplified by the High Court as a driving decision by a government employee—is simply not protected. *Id.* at 325 n. 7, 111 S.Ct. 1267; *see Cope,* 45 F.3d at 448.

As noted above, courts have interpreted the failure to warn of a known hazard as both within and outside of the discretionary function exception. *See Rosebush,* 119 F.3d at 443; *Summers,* 905 F.2d at 1215. In the Tenth Circuit, however, several cases support a conclusion that a failure to warn does not fall within the discretionary function exception. For example, in *Smith v. United States,* 546 F.2d 872 (10th Cir. 1976), the plaintiff was injured and burned when he fell into a thermal pool in Yellowstone National Park. The court rejected the Park Service's argument that its decision not to post warnings in the thermal pool area was based upon its implementation of a policy to conserve the natural scenery of the park and that such a decision was protected by the discretionary function exception. *Id.* at 876–77. Instead, the court held that the failure to warn about the known dangers of the thermal pools in an undeveloped area (but an area where the Park Service erected a parking lot) did not fall within the exception. *Id.*

Similarly, in *Boyd v. United States,* 881 F.2d 895 (10th Cir.1989), the plaintiff's husband was killed when he was struck by a boat while swimming in a Government owned lake. Although the court agreed that decisions on zoning the lake for swimming, boating, or both, were discretionary, thus satisfying the first step in the discretionary function analysis, the court concluded that the Government's failure to warn swimmers that boats were permitted in the same swimming area did not fall within the second part of the exception because its decision did not "implicate any social, economic, or political policy judgments." *Id.* at 898.

Most recently, and more closely aligned with the facts of this case, in *Duke v. Department of Agriculture,* 131 F.3d 1407 (10th Cir.1997), the court held that the exception did not apply to the Forest Service's decision not to warn campers about falling rocks at a New Mexico campsite. In *Duke,* the plaintiff, a six year-old boy, was injured when a rock rolled down a hillside and smashed his tent. The court noted that the Forest Service had some knowledge that rocks had previously fallen in that area. The court began its discretionary function exception analysis by stating that if decisions that involve choice and any hint of policy concern—which the court hinted would be almost every decision by a government agency—were routinely excepted from the FTCA, this ap-

proach would eviscerate the FTCA and " 'allow the exception to swallow the FTCA's sweeping waiver of immunity.' " *Id.* at 1411 (quoting *Cope,* 45 F.3d at 449). The court then turned to cases where the discretionary function exception had been applied for a failure to warn. In those cases, the court recognized that public policy issues that supported the failure to warn were usually "readily identifiable." For instance, in *Kiehn v. United States,* 984 F.2d 1100, 1105 (10th Cir.1993), the decision not to post warnings in a wilderness area alerting climbers to the dangers of falling off a rock was grounded in a policy to leave the area unaffected and to protect the natural scenery. Similarly, in *Johnson v. United States Dep't of Interior,* 949 F.2d 332, 338 (10th Cir.1991), the decision not to post warnings in a wilderness area at the Grand Tetons about the dangers of snowpack while mountain climbing was based on a policy of leaving the area as a wilderness. *See also Zumwalt v. United States,* 928 F.2d 951 (10th Cir.1991) (failing to warn about danger of caves was based on policy of leaving area as a wilderness).

The *Duke* court distinguished these cases by noting that the area involved at the New Mexico campsite was not an area set aside as a wilderness. In fact, a road intersected the area and the Forest Service encouraged persons to park there by providing a parking area with marked parking lines. Thus, any concerns about leaving the area as a wilderness were no longer valid. Posting adequate signs warning of the dangers of falling rocks would not then detract from the area's non-wilderness character. *Duke,* 131 F.3d at 1412. The court then concluded that where a known specific hazard exists, distinct from the universe of hazards that may exist in a wilderness area, and where a claim of preserving the wilderness character of the land is not a concern, the court concluded that the failure to warn against the danger does not fall within the discretionary function exception. *Id.* at 1412.

Although outside the Tenth Circuit, another case supporting the denial of the discretionary function exception in similar circumstances is *Cope v. Scott,* 45 F.3d 445 (D.C.Cir.1995). *Cope* is important because it concerns the application of the exception to an alleged inadequacy in the posted warnings along National Park Service roadway. In *Cope,* the court concluded that the plaintiff's claim of inadequate warnings did not fall within the discretionary function exception. The court noted that the Park Service had already placed signs on the roadway warning drivers about all sorts of hazards, including signs warning of slippery conditions when the road was wet. Therefore, the Park Service could not rely an any policy consideration couched in "aesthetic" or "engineering" concerns. The court then concluded that once the Park Service undertook the obligation to warn about hazards and place signs along the roadway, "it cannot argue that its failure to ensure that those steps were effective involves protected 'discretionary' decisions." *Id.* at 452; *see also Faber v. United States,* 56 F.3d 1122, 1124 (9th Cir.1995) (noting that questions concerning the adequacy of warnings in a national forest are not typically related to protected public policy decisions).

Although it remains a close question given the state of the case law on this issue, this court concludes that the decisions reached in *Smith, Boyd, Cope,* and *Duke* support a determination that the discretionary function exception does not apply in the present case. Like the plaintiff in *Cope,* the plaintiffs here assert that the Forest Services's efforts at warning about the dangerous rock hazard that existed at the Hanging Rock Picnic Area were inadequate. Any discretionary policy decisions concerning whether to close the area or place a barricade or fence around the dangerous area, or whether to leave the area open and warn visitors about the danger, or simply do nothing, had already been reached by the time the signs were affixed to the pole fence at the picnic area. Any aesthetic concerns about the impact the signs or the pole fence may have had on the natural beauty of the picnic area had

already been debated and resolved in favor of installing the fence and placing the signs in an effort to warn visitors of the dangerous rock fall hazard.

Thus, all decisions that may have been grounded in some form of "social, economic, or political" policy at the Hanging Rock Picnic Area had already been reached by the time Rodrigo Figueroa walked through the fence and was fatally struck by a falling rock. The Forest Service exercised its discretion by deciding to put up a fence with warning signs in order to ostensibly warn visitors of the rock fall danger. The discretionary aspect of this decision and any policy concerns were resolved as soon as the Forest Service decided to open up the picnic area with those improvements in place. Having made the discretionary policy decision to warn visitors about the rock fall hazard rather than close the picnic area, the Forest Service cannot now persuasively argue that its failure to ensure that those warnings were adequate somehow involves a discretionary decision that falls within the discretionary function exception.[4] *See Cope,* 45 F.3d at 452; *see also Duke,* 131 F.3d at 1412 (holding that failure to warn of danger of boulder rolling down slope did not implicate political, social, or economic decisions of the sort the discretionary function exception was designed to protect); *Faber,* 56 F.3d at 1124 (stating that "[i]t is clear that the question

of what constitutes an adequate warning is not typically related to broad public policy").

Simply stated, the alleged failure of both the fence and the signs to give adequate warning of the rock fall danger is simply not the type of act that is "of the nature and quality that Congress intended to shield from tort liability." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Rather, "a failure to adequately warn involves considerations of safety, not public policy." *Faber,* 56 F.3d at 1125. Once the decision to warn has been made, it is impossible to understand how an allegedly inadequate warning can "be based on the purposes that the [Forest Service's] regulatory regime seeks to accomplish." *Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. 1267. Accordingly, the second step of the discretionary function exception analysis, as laid out by the Supreme Court and this circuit, has not been met. *See Duke,* 131 F.3d at 1412; *see also Cope,* 45 F.3d at 451 (holding that failure to post adequate street warnings was not a decision "fraught with public policy considerations"). Therefore, the United States' motion for summary judgment on the basis of the discretionary function exception is denied.[5]

---

**4.** It is not hard to imagine the absurd results that might occur if the court concluded that the discretionary function exception applied to these facts. For example, assume the very same harm present in this case—rock fall harm. Now assume that the District Ranger for the Forest Service decided that the warning signs should be written in Latin—*Area Lapsus Saxum* ("Area of Falling Rocks"). The lucky few who have received a classical education would know to stand clear. But for the rest of us, the warning would have no meaning whatsoever. Thus, even though the warning would be almost completely ineffective in communicating the message that a falling rock danger was present, the Forest Service would be shielded from liability by the discretionary function exception. This result is patently absurd and is not too far off the mark in the present case.

**5.** To the extent the plaintiffs assert claims against the United States for negligently supervising the work of S & L Services (as outlined in ¶ 10 of Pls. Second Am.Compl.), these claims fall within the discretionary function exception as explained by the Supreme Court in *Varig Airlines,* 467 U.S. at 815, 104 S.Ct. 2755. *See Domme v. United States,* 61 F.3d 787, 792–93 (10th Cir.1995) (reasoning that the government's choice regarding inspection of work performed by independent contractor was policy based and protected by the discretionary function exception); *Layton v. United States,* 984 F.2d 1496, 1502–03 (8th Cir.1993) (concluding that claim charging the Forest Service with negligently supervising operations of independent contractor was barred by the discretionary function exception). Therefore, the United States' motion for summary judgment on this claim is granted.

## II

Even if the discretionary function exception does not apply, the United States argues that summary judgment should nevertheless be granted in its favor because Utah's Limitation of Landowner Liability Act, Utah Code Ann. § 57–14–1 *et seq.*, provides the United States with immunity. This argument is echoed by S & L Services.

All sides agree that because this accident occurred on federal land in Utah, the tort law of the state of Utah applies. *See Ewell v. United States*, 579 F.Supp. 1291, 1293 (D.Utah 1984), *aff'd*, 776 F.2d 246 (10th Cir.1985). Under Utah law, the Limitation of Landowner Liability Act limits the liability of certain landowners (and others who control that land) who have opened up their land for recreational use. *See* Utah Code Ann. § 57–14–3 (Michie 1994).[6] There are two exceptions to this protection. The first, applies if the landowner charged a fee to use the land. Utah Code Ann. § 57–14–6(2). This exception is inapplicable here. The parties concede no fee was charged.[7] The second exception applies if the landowner acted willfully or maliciously in failing to guard or warn against a dangerous condition, or where the landowner deliberately, willfully, or maliciously caused the claimed injury. Utah Code Ann. § 57–14–6(1). For reasons discussed later in this opinion the court does not need to resolve this issue.

In arguing that the Utah Act grants immunity, both defendants rely heavily on an unpublished decision in the case involving Elizabeth Holton, the young woman who was first killed by a falling rock in the picnic area. (*See Holton v. United States*, 2:97–CV–0584C, Order dated Oct. 8, 1997.) In *Holton*, the court held that the Hanging Rock Picnic Area fell within the type of land covered by the Utah Act and that the United States, as landowner, was entitled to immunity. (*See* Order at 3–6.) In reaching this conclusion, the court relied heavily on *DeBaritault v. Salt Lake City Corp.*, 913 P.2d 743 (Utah 1996), a recent Utah Supreme Court decision that established the status of the land as the characteristic that controlled the determination of whether a landowner was immune under the Act.

■ Under *DeBaritault*, to qualify for immunity under the Act, the land in question must have some combination of the following characteristics: (1) rural; (2) undeveloped; (3) appropriate for the type of activities listed in the Act; (4) open to the public without charge; and (5) a type of land that would have been open in response to the Act. *Id.* at 748. Although the court in *Holton* concluded that these characteristics were indeed present at Hanging Rock, a more recent Utah Supreme Court case and a close examination of the picnic area suggests otherwise.

### A. Is Hanging Rock a "Rural" Area under Utah's Limitation of Landowner Liability Act?

The court in *Holton* concluded that the picnic area satisfied the rural component of the Utah Act because it is a "large, remote, natural area," and that these fea-

---

**6.** The Act reads in part as follows:

Except as provided in Subsections (1) and (2) of Section 57–14–6, an owner of land owes no duty of care to keep the premises safe for entry or use by any person using the premises for any recreational purpose, or to give any warning of a dangerous condition, use, structure, or activity on those premises to those persons.
Utah Code Ann. § 57–14–3 (Michie 1994).

**7.** However, beginning October 1, 1995, the Uinta National Forest had the power to collect fees for the use of all picnic areas within the Forest as part of the "Recreational Fee Demonstration Program." *See* 16 U.S.C.A. § 4601–6a (West 1998) (notes on Pub.L. 105–83). Sometime in 1997, the Uinta National Forest, now designated as the "American Fork Canyon—Alpine Loop Recreational Area," erected an entrance station at the mouth of American Fork Canyon. Visitors to the area must now pay a three dollar fee per carload to use the parking, picnic facilities, and trail heads. In the event a person visiting the area had paid the fee and was injured, the Utah Limitation of Landowner Liability Act would no longer apply.

tures distinguished the picnic area from the urban playground that was found outside the Act in *DeBaritault.* The record before this court, however, suggests that the Hanging Rock Picnic Area is not quite a "large, remote, natural area."

First, concerning size. The record indicates that the entire picnic area measures just three hundred feet in length and two hundred feet in width. (Decl. of Melissa Yvonne Crumpton, at ¶ 3, attached as Ex. A. to the United States' Mem. in Support of Mot. for Summ.J.) This is hardly a "large" area. At 1.38 acres,[8] the picnic area is not much larger than a standard athletic field, a site that other courts have concluded is outside the scope of recreational immunity statutes such as Utah's. *See, e.g., Seiferth v. Downingtown Area School Dist.*, 145 Pa.Cmwlth. 562, 604 A.2d 757, 759 (1992) (concluding that a relatively unimproved lacrosse field [measuring approximately 330 feet × 150 feet] was outside the protection of Pennsylvania's recreational immunity statute because "the field was built and designed in a manner that enhanced the value and utility of the land and adapted the land for a new purpose [and][f]urther, the field is comparatively small in size and is, thus, relatively easy to keep in a safe condition").

As the New Jersey Supreme Court has noted, the largeness of the site in question is an especially relevant characteristic. Unlike owners of small lots, "[o]wners of [large sized tracts of land] would have difficulty in defending their lands from trespassers or, indeed, even in taking precautions to render them safe for invited persons, engaging in these kinds of energetic outdoor activities." *Harrison v. Middlesex Water Co.*, 80 N.J. 391, 403 A.2d 910, 914 (1979). The important public policy of both preserving and opening up such large tracts of land is advanced by "affording these property owners a modicum of protection from tort liability ...

which would encourage such owners to keep their lands in a natural, open and environmentally wholesome state." *Id.; see also Wymer v. Holmes*, 429 Mich. 66, 412 N.W.2d 213, 219–20 (1987) (noting that recreational use statute was intended to apply to large tracts of undeveloped land, "which are difficult to defend from trespassers and to make safe for invited persons engaging in recreational activities").

No such concerns are present here. This is simply not a tract of land so large that it could not be patrolled or made safe for visitors. In fact, the picnic area was patrolled by the Forest Service personnel at least once a day, and employees of S & L visited the picnic area several times a day to clean the site and make sure things were in order. The Forest Service could and did take steps to keep trespassers out of the picnic area. The Forest Service designated the picnic area for "day use" only and caused a steel gate at the parking lot entrance to be locked every evening and opened each morning. This simply is not the type of land that Utah courts have heretofor recognized as coming within the Act. *Cf. Loosli v. Kennecott Copper Corp.*, 849 P.2d 624, 625–26 (Utah Ct.App.1993) (affirming finding that defendant was protected under that Act, in part, because large sand dune area used by off-road vehicles was not patrolled or supervised by defendant and defendant did not provide any services at site); *see Nelson v. Salt Lake City*, 919 P.2d 568, 572 (Utah 1996) (holding that Act did not apply to ballfield, playground, and nearby path bordering the Jordan River). *But see Young v. Salt Lake City Corp.*, 876 P.2d 376, 379 (Utah 1994) (although the court held that the Act did not apply to the facts of this case, the court noted, in dicta, that a narrow paved roadway running up City Creek Canyon may come within the Act's protection).

---

**8.** For some reason, the affidavit submitted by the United States refer to the picnic area as encompassing five acres. (*See* Decl. of Melissa Yvonne Crumpton, at ¶ 3.) An area of 300 feet by 200 feet, however, measures 60,000 square feet. An acre is measured at 43,560 square feet. Thus, rounded off, the picnic area only encompasses 1.38 acres, not five acres.

Nor was the picnic area a spot that is necessarily "remote." Indeed, Hanging Rock Picnic Area, before dismantling, was located just four miles from the mouth of American Fork Canyon and the nearby cities of Highland, Alpine and American Fork. Combined these cites have a population of over twenty-nine thousand people. The picnic area's relative proximity to these cities may account for its status as the most popular picnic area in the Uinta National Forest. Route 92, a heavily trafficked state highway, passed directly in front of the picnic area and served as the picnic area's only access road. Moreover, Route 92 is a feeder road from Interstate 15, the main north/south route in the state. Using Interstate 15 and Route 92, a visitor from the urban and population center of the state, Salt Lake City, would only have to travel thirty-seven miles (a trip of approximately forty minutes) to reach the picnic area.[9]

In concluding that the picnic area was a "large, remote, natural area" that fell within the protection of the Act, the *Holton* court relied on two Louisiana cases. As cited by the *Holton* court, both of these cases concluded that "size, naturalness and remoteness or insulation from populated areas" are characteristics to be considered in determining if the property at issue is rural for purposes of a recreational immunity statute. *See Keelen v. State*, 463

So.2d 1287, 1290 (La.1985); *Holder v. Louisiana Parks Service, Inc.*, 493 So.2d 275, 277 (La.Ct.App.1986). Interestingly, in both cases the courts concluded that there was insufficient evidence in the record to make such a determination. Such is the case here.

Neither the United States nor S & L Services has offered detailed evidence regarding the rural or remote character of the picnic area. Indeed, the record contains no less than four different maps that purport to depict the picnic area, none of which agree with the others. (*See* United States' Mem. in Support of Mot. for Summ.J., Exs. F1–6; S & L Services, Inc.'s Mem. in Support of Mot. for Summ. J., Ex. A, at 50; Def. S & L Services, Inc.'s Expert Report of Bruce Hronek, at \*12; Decl. of Kim J. Martin dated January 12, 1999, Ex. A.)[10] It appears from court records that the court in *Holton* did not have the benefit of this contradictory evidence. In the present case, the only uncontradicted evidence offered by the defendants in support of the "rural" character of the picnic area is testimony concerning the bare dimensions of the picnic area. No evidence has been offered as to the picnic area's proximity to populated area's or its remoteness. As noted, no such evidence was before the *Holton* court. Summary judgment is footed on uncontroverted evidence, not on factual assumptions.

---

9. These facts were neither presented in defendants' motions or plaintiffs' opposition. The court, relying on a map of the state of Utah and information generally available from the United States Census Bureau, has provisionally noticed these characteristics. *See* Fed. R.Evid. 201

10. Particularly troubling is the map filed by S & L with its expert's report. (Def. S & L Services, Inc.'s Expert Report of Bruce Hronek, at \*12.) This map describes a picnic area unlike that described by any other evidence now before the court. Only after inquiring of counsel for S & L was the court made aware that this map was not an accurate depiction of Hanging Rock. If the accuracy of previously presented evidence is called into question, counsel must alert the court to that fact. The accuracy of this particular map

was apparently called into question during a deposition taken on or about September 28, 1998. Nothing was said at the hearing on January 6, 1999.

Also troubling is a piece of evidence offered by both defendants. Both the United States and S & L offered a memorandum written by Kim Martin dated January 20, 1995. (United States Mem. in Support of Mot. for Summ.J., at Ex. 5; S & L Services Mem. in Support of Mot. for Summ.J., at Ex. C.) However, the presentation of this evidence differs. The United States only offered the first page of the memo. It made no mention of a second page. S & L, however, offered two pages. Interestingly, the second page, and the page not offered by the United States, has been redacted. Neither party informed the court of the basis for the redaction nor that a page of the memo was missing.

On the record before the court, the court cannot say that, as a matter of law, the Hanging Rock Picnic Area is a "rural" area within the meaning of Utah's Limitation of Landowner Liability Act. *See Nelson v. Salt Lake City,* 919 P.2d at 572 (concluding that Act did not apply to field and nearby path that covered many more acres and is no more improved than the Hanging Rock Picnic Area).

### B. Is Hanging Rock an "Undeveloped" Area under the Utah Act?

Even assuming that Hanging Rock could be a "rural" area under the Utah Act, the immunity provided by the Act will not attach unless it is also determined that the land on which the claimed injury occurred was also "undeveloped." *See DeBaritault,* 913 P.2d at 748 (stating that the characteristic of "undeveloped" is another "prerequisite to immunity under the recreational use statutes"). Although Utah court's have not defined "undeveloped" in the context of the Utah Act, they have instead examined the land in question to see whether it may be classified as "improved." *See Nelson,* 919 P.2d at 572; *DeBaritault,* 913 P.2d at 748. In particular, the Utah Supreme Court has concluded that a small playground covered in cement was an "improved" site and therefore outside the Act's protection. *See DeBaritault,* 913 P.2d at 747–48. The Utah Supreme Court has also concluded that a several acre park that bordered the Jordan River nature walkway, and contained a playground and several open ballfields, was also an "improved public park" and outside the Act. *See Nelson,* 919 P.2d at 572.

The Forest Service has itself designated the Hanging Rock Picnic Area as a "developed" area within the Uinta National Forest. (*See* Operating Plan at 1 ("This Operating Plan has been developed by [the Forest Service and S & L] ... to clearly define the roles and responsibilities of the Permittee in operating, maintaining and reconditioning *developed* recreation facilities included in this permit.") (emphasis added)). This characterization is consistent with the Forest Service's previously published definition of a "developed" recreation site. Although the version of the Forest Service Manual in effect at the time Rodrigo was fatally injured did not define a "developed" recreation site, as noted by the federal courts in Michigan and California, an older version of the FSM offered a comprehensive definition. *See Weaver v. United States,* 809 F.Supp. 527 530 (E.D.Mich.1992) & *Judd v. United States,* 650 F.Supp. 1503, 1507 (S.D.Cal.1987) (quoting then section 2330.5 of the FSM). This definition bears repeating here.

Existing development (developed) sites consist of modifications to enhance recreational opportunities, in addition to the land, water, and vegetation....

There is no specified kind, number, arrangement or cost of facilities which determine the existence of a developed site. This determination is based on the management in instituting the site modification. As a general rule, however, a developed campground will usually include a toilet, garbage containers, fireplaces or fire rings in grates or stoves, a campground sign, and a bulletin board or poster board. Other developed site kinds will have similar degrees of development.

... The following criteria are useful in making such determinations:

1. A developed site has been modified to accommodate one or more specific recreation opportunities for intensive rather than dispersed uses and is one of the site kinds listed in the first paragraph above. Modification must include facility installation.

2. At developed site the modifications are to enhance recreation opportunities, and not merely those needed for resource protection or to satisfy administration needs.

3. Developed sites are documented by approved site designs (FSM 2330.3).

4. For developed sites it is desirable to publish locative and other site information in directories and on maps to

help people find the site and to encourage continued or additional use.

... The development site consists of the actual developed area and also the peripheral area surrounding the developed area. This peripheral area is an integral part of the development site on which modified land management practices are required in order to preserve environmental characteristics.

*Judd,* 650 F.Supp. at 1507–08 (quoting Forest Service Manual section 2330.5). This definition is consistent with the Department of the Interior's present definition of a "developed" site:

"Developed sites and area" means sites and areas that contain structures or capital improvements primarily used by the public for recreation purposes. Such sites or areas may .include such features as: delineated spaces for parking, camping or boat launching; sanitary facilities; potable water; grills or fire rings; tables; or controlled access.

43 C.F.R. § 8360.0–5(c) (1998). It is also consistent with the Forest Service's present site classification system, which groups recreational sites that have obvious traffic controls, access by high-speed highways, flush toilets, and mowed lawns as "urban" class, and a five-out-of-five on the Forest Service's "Development Scale." (*See* FSM 2330.3, Ex. 1.)

An examination of these factors, along with the Forest Service's self-description of the area as "developed," leads the court to conclude that Hanging Rock Picnic Area may well be a "developed" area. Other courts have come to similar conclusions.

In *Soto v. United States,* 748 F.Supp. 727, 728–29 (C.D.Cal.1990), the district court was called upon to determine whether a picnic ground in a larger national forest was "developed." The area at issue was the Stoneyvale pool site—a naturally occurring pond found in the in the 650,000

acre Angeles National Forest. First, the court noted that the picnic grounds were adjacent to one of the largest metropolitan areas in the United States—Los Angeles. Second, as for improvements, the court noted that the area was within walking distance of a large parking lot and an improved picnic area. Also close by was a campground, where overnight camping was permitted. *Id.* at 728. Finally, the court noted that usage at the site was "intense." There were hundreds of visitors every summer weekend, so many that the parking lot overflowed. Despite the fact that the Forest Service had itself classified the Stoneyvale area as "undeveloped," the court concluded that the presence of these conditions and the existence of these characteristics made the Stoneyvale pool a "de facto 'developed site.'" *Id.* at 729.

The limited evidence now before this court may well compel a similar conclusion.[11] As previously mentioned, Hanging Rock is just minutes from the large urban centers of Utah. (Stoneyvale was just 35 miles from Los Angeles, Hanging Rock is just 37 miles from Salt Lake City.) The picnic area is located on a heavily traveled state highway that serves as a feeder from the main north/south interstate in Utah. The picnic area was marked by a large sign and guarded by large steel gates that were closed and locked every evening and used to secure the site when visitors were not welcome. (*See* Decl. of Kim J. Martin, ¶ 12 & Ex. B.) The gates were boldly marked with some reflective materials, ostensibly to warn drivers and others that they were there. (*See id.* at Ex. B.) Inside the gates there was a paved parking lot, large enough for twenty-five cars. Because the site was extremely popular, it was not uncommon for the parking lot to fill and for visitors to park their cars up and down the adjacent state highway. In-

11. Although neither the United States nor S & L submitted any evidence with their motions concerning the characterization of Hanging Rock Picnic Area as an undeveloped or unimproved site, *post*-argument the United States filed the declaration of a Forest Service engineer, Kim Martin, that gives the court a glimpse of the developed or undeveloped nature of the picnic area. (*See* Decl. of Kim J. Martin, dated Jan. 12, 1999)

deed, it appears that an area noted as "undesignated parking" was specifically set aside for overflow use. (*See id.* Ex. A.) Immediately adjacent to the parking area was a grassy area for picnicking that was routinely manicured. (*See* Depo. of Robert Easton, dated Sept. 28, 1998, at 7.) There were permanent drinking fountains dispersed throughout the grassy picnic area. (*See* Decl. of Kim J. Martin, at Ex. A.) The picnic area had its own underground sprinkler system and was routinely cleaned, several times daily, of both manmade and natural refuse. (*See id.;* Depo. of Robert Easton, at 7; Depo. of Donna Stanworth, dated March 9, 1998, at 4, Depo. of Paul Stanworth, dated March 9, 1998, at 8.) A bathroom was built and regularly maintained. Adjacent to the parking lot were several concrete "pads," each of which contained several permanent barbecue grills. (Decl. of Kim J. Martin, at ¶ 8.) In addition, the Forest Service had previously re-directed the American Fork River from its natural place in the center of the picnic area to its present location adjacent to the cliff face. This man-made change, apparently an effort to attract more visitors, both increased the area of public enjoyment and created a more scenic vista.

The existence of these conditions and improvements, along with the Forest Service's own characterization of the picnic area as a "developed" facility, may well support a conclusion that, on the record before the court, the Hanging Rock Picnic Area, like the Stoneyvale pool in the Angeles National Forest, is a developed site. Of course, such a determination would weigh against the defendants' claims that they are immune from suit under Utah's Limitation of Landowner Liability Act. *See DeBaritault,* 913 P.2d at 748.

#### C. Remaining Characteristics.

It is undisputed that Hanging Rock Picnic Area is an appropriate location for

many of the activities listed in the Utah Act. Indeed, picnicking, studying nature, and viewing scenic sites—all activities the Figueroa family contemplated when they visited the picnic area—are expressly listed in the Act. Utah Code Ann. § 57–14–2(3). Nor is there any dispute about fees. The parties acknowledge that no fee was paid by Rodrigo or his family to visit the national forest or, more specifically, the picnic area. And, finally, the court agrees with the analysis set forth in *Ewell v. United States,* 579 F.Supp. at 1294–95, that even though federal park lands, such as Hanging Rock, were not opened in response to the Utah Act, they may well be a type of land that would have been opened in response to the Act and may therefore fall within the Act's protection. *See also Guttridge v. United States,* 927 F.2d 730, 732–34 (2d Cir.1991) (concluding that although the United States opened the area in question to public use before passage of New York's recreational use statute, the United States was nevertheless protected by the statute). Each of these conclusions weighs in favor of the defendants' claims that they are immune from suit the Utah Act. *See DeBaritault,* 913 P.2d at 748.

Nevertheless, after examining all the factors and characteristics enumerated by the Utah Supreme Court in *DeBaritault,* this court concludes that these factors, on the present record, weigh against the defendants' position that, as a matter of law, they are entitled to immunity under Utah's Limitation of Landowner Liability Act. Therefore, the defendants' motions for summary judgment on this ground are denied.[12]

### III

The United States and S & L have asserted several other legal theories in support of their respective motions for summary judgment. Although none of

---

12. The court's conclusion that the defendants, on the present record, are not entitled to immunity under Utah's Limitation of Landowner Liability Act negates any need for the

court to examine the issue of willfulness or maliciousness under the Act. *See Perrine v. Kennecott Mining Corp.,* 911 P.2d 1290, 1294 n. 2 (Utah 1996).

these arguments were raised at the January 6, 1999 hearing, each was fully briefed.

### A. Plaintiffs' Wrongful Death and Negligence Claims

The United States argues that plaintiffs' wrongful death claim must fail as a matter of law. Reduced to its basic premise, the court understands this argument as follows: by erecting the pole fence and attaching the warning "Falling Rock Area," the United States satisfied the reasonable care standard required under Utah law. It is undisputed that the United States took these steps. If, as the United States argues, there were no other indications or history of any natural rock fall in the picnic area other than the one incident involving Elizabeth Holton, these steps may have been enough. The record before this court, however, is not entirely consistent with that position. For example, in a memo drafted by an engineer for the Forest Service after Rodrigo's death, the engineer expresses concern over other "unrecorded near misses" in the picnic area. (*See* Memorandum of Kim J. Martin, dated Sept. 7, 1995, attached as exhibit to Pls. Mem. in Opp. to United States' Mot. for Summ.J.) Moreover, on the day that Rodrigo was killed, and while an investigation into his death was underway, Forest Service personnel witnessed additional rock fall. (*See* Depo. of David Hohl, dated Sept. 30, 1998, at 28.) In addition, the roof of the bathroom at the picnic area had to be replaced because of damage done by rocks. (*See* Depo. of Robert Easton, at 9–11.) Loose rocks were also discovered in the grassy picnic area and were picked up from time to time by the Forest Service. (*See id.* at 8–11, 20.) These rocks left indentations in the soft ground indicating that they may have fallen from some height. (*See id.* at 8, 21.) The Forest Service also recognized that in the area of American Fork Canyon—the area Hanging Rock was located in—falling rocks were a concern and rocks were known to have fallen in visitor areas. (*See id.* at 14, 16–18, 24.) [13] Despite this knowledge, the Forest Service did nothing to warn visitors in these areas of the rock fall danger. (*See id.* at 14, 16–18.) [14] The record also indicates that some Forest Service personnel may have had knowledge that rocks had fallen off the cliffs at Hanging Rock even before Elizabeth Holton was killed. (*See* Depo. of Peter Karp, dated Sept. 28, 1998, at 20–21.)

█ Despite this record, the United States argues, unconvincingly, that as a matter of law the Forest Service had no

---

**13.** Q: Had you ever had reported to you or heard like about occurrences of falling rocks, not necessarily in this area, but other places in the American Fork Canyon?
A: Yes.
Q: And where would the other area have been?
A: Little Mill campground. **Along the highway [State Route 92] up and down the canyon we had quite a bit of rock fall**....
Q: Now, the Little Mill [campground] is just above Hanging Rock picnic area?
A: Yes.
Q: Would you have rocks that fall into camping areas there?
A: Yes.
Q: And how long had that been going on?
A: Well, I assume, and I don't know for sure, that it probably had been going on since it was built....
Q: Had it been going on since you were the district ranger [1987]?
A: Yes.

(Depo. of Robert Easton, at 14–15.) (emphasis added).
Q: Did any of the people that participated [in a hazard assessment at Hanging Rock] report to you following Elizabeth Holton's death that rock falls have been an ongoing problem in the canyon?
A: I don't know that specific item, but we all knew they were. **You know, there was a lot of rock fall in the canyon.**
Q: So that had been general knowledge that preceded Elizabeth Holton's death even?
A: Yes, I'm sure that's—
(Id. at 24.) (emphasis added).

**14.** Q: Did the Forest Service directly do anything to warn campers in Little Mill or picnickers in Little Mill about the hazard of rock fall from above?

A: I'm not aware of anything.
(Depo. of Robert Easton, at 17–18.)

duty to warn visitors to Hanging Rock of the dangerous rock fall. Citing the Restatement (Second) of Torts § 343, the United States asserts that there was no duty to warn because the rock fall danger did not present an unreasonable risk of harm that visitors to the picnic area would not have discovered or realized on their own. The record before the court, however, is uncontroverted that a young woman and a teenage boy were instantly killed by falling rocks. There is no suggestion in the record or otherwise that visitors to the picnic area would discover or realize the fatal nature of that harm just by viewing the scenery at Hanging Rock. Indeed, the United States has argued elsewhere in its motion that the risk of rock fall at Hanging Rock was anything but self-evident and was not recognized until the fatal injuries occurred. (*See, e.g.,* United States' Mem. in Support of Mot. for Summ.J. at 35–36.) Thus, the obviousness of the rock fall danger, and, in turn, the Forest Service's duty to warn, remains a disputed issue of material fact. Under these circumstances, and drawing all factual inferences in favor of the plaintiffs as the non-moving party, the court cannot say as a matter of law that the Forest Service did not have a duty to warn visitors of the known hazard of rock fall at Hanging Rock.

■ Assuming there was a duty to warn, the United States nevertheless argues that there is no support for plaintiffs' claim that the Forest Service breached this duty. However, because there remains a question of material fact concerning the scope of the Forest Service's knowledge of the rock fall hazard, and because any questions on the adequacy or reasonableness of the warnings given by the Forest Service can only be resolved after determining what, if anything, the Forest Service knew about the rock fall hazard, the court is not now in a position to rule, as a matter of law, that the pole

fence and the wooden signs constituted a reasonable warning.[15]

Moreover, there is remains a factual dispute as to whether Rodrigo and/or all members of his family saw the purported warnings. In addition, the plaintiffs have presented the uncontradicted testimony of an expert who opined that the fence and signs were inadequate warnings. (*See* Report of Alan Jubenville, Ph.D, at 3–5, attached to Pls. Mem. in Opp. to United States' Mot. for Summ.J.) Because the adequacy or reasonableness of a warning presents an issue of fact, summary judgment is generally inappropriate. *See, e.g., House v. Armour of America, Inc.,* 929 P.2d 340, 346 (Utah 1996) (affirming denial of summary judgment and recognizing that "reasonable minds could reach different results on whether this information provided an adequate warning"); *Canfield v. Albertson's, Inc.,* 841 P.2d 1224, 1227 (Utah App.1992) (reversing summary judgment and concluding that "the determination of reasonableness, and negligence [*viz.* property owners and invitees], lies within the province of the jury"). Therefore, the United States' motion on these grounds is denied.

### B. Plaintiffs' Emotional Distress Claims

■ As a threshold issue, the United States argues that the court lacks jurisdiction over the plaintiffs' claims for negligent infliction of emotional distress because the plaintiffs did not present these claims in their initial administrative claim to the Forest Service—a jurisdictional prerequisite to bringing an action under the FTCA. *See* 28 U.S.C. § 2675. In order to satisfy this jurisdictional requirement, an administrative claim must contain two elements: (1) it must contain a written statement sufficiently describing the injury to enable the agency to begin its investigation; and (2) it must set forth a sum certain in damages. *See Cizek v. United States,* 953

---

**15.** Notably, the United States has not offered any evidence as to the adequacy or reason-

ableness of the posted warnings.

F.2d 1232, 1233 (10th Cir.1992). The United States argues that plaintiffs have failed to satisfy both elements.

Starting with the second element first. It is undisputed that the plaintiffs' claim stated a total amount in damages of $1.5 million. What the United States argues is that this damage amount must be broken down based upon the causes of action the plaintiffs' are pursuing—*e.g.,* $1 million for negligence and $500,000 for negligent infliction of emotional distress. However, there is no such requirement in the statute. *See* 28 U.S.C. § 2675(b). The Standard Form 95 that was timely submitted by the plaintiffs contains three categories of money damages: property, personal injury, and wrongful death. The plaintiffs appropriately—given the fact that their son and brother was killed by the falling rock—submitted their damages under "wrongful death." [16]

■ As the Fifth Circuit has stated, the purpose of the notice requirement will be served " 'as long as a claim brings to the Government's attention facts sufficient to enable it thoroughly to investigate its potential liability and to conduct settlement negotiations.....' " *Frantz v. United States,* 29 F.3d 222, 224 (5th Cir.1994) (quotation omitted). The court has no doubt but that the sum claimed by the plaintiffs in their administrative claim satisfies that purpose. This conclusion is buttressed by the fact that the plaintiffs are not now seeking any damages in excess of the $1.5 million. Indeed, under the statute they could not. *See* 28 U.S.C. § 2675(b) ("Action under this section shall not be instituted for any sum in excess of the amount of claim presented to the federal agency....."). Under these circum-

stances, the court concludes that by submitting the claim as they did, the plaintiffs have satisfied the sum certain requirement of 28 U.S.C. § 2675(b).[17]

For similar reasons, the court finds that the plaintiffs have satisfied the first element as well. The administrative claim submitted by the plaintiffs listed those injured as "The parents and brothers and sisters of Rodrigo, all present at the time of his death...." As a basis for their claim, the plaintiffs provided facts concerning the date of the event, the location of the event, the activity the Figueroa family was engaged in immediately before Rodrigo's death, and the events surrounding Rodrigo's death. The claim further indicates that "family members" were all by the side of the river taking family photos just before and after Rodrigo's death. The notice also proclaims the nature of the injury as the "los[s] of love care, society, companionship, counsel laughter and good humor of their son and brother."

As mentioned in *Frantz,* the notice requirements of § 2675 were instituted to " 'ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.' " *Frantz v. United States,* 29 F.3d at 224 (*quoting* S.Rep. No. 1327, 89th Cong., 2d Sess. 6 (1966), *reprinted in* U.S.C.C.A.N. 2515, 2516 (1966)). Providing the United States with the necessary facts to investigate and assess the asserted claim or claims fulfills this purpose. *See id.*

In this case, the administrative claim, which was filed on behalf of the surviving Figueroa family members, notified the

16. In the directions to the standard form, claimants are advised that if they have both personal injury and property damages, these damages must be separately stated. *See* Standard Form 95, ¶ 12. There is no direction, however, that personal injury damages must be separated from wrongful death damages.

17. This conclusion is consistent with the Tenth Circuit's decision in *Cizek,* 953 F.2d at 1234. In *Cizek,* the court concluded that the

sum certain requirement was not satisfied. In that case, however, no sum whatsoever had been included with the claim. Rather, the claimant listed her damages as "ongoing." *Id.* This information could not possibly assist the United States in assessing its liability or conducting settlement negotiations. Those purposes, however, are satisfied where, as here, a claimant provides the United States with sum certain of his or her total damages.

Forest Service that the entire Figueroa family was present at Hanging Rock on the day that the rock fell and killed Rodrigo. The claim may be fairly read to state that these persons were in close proximity to Rodrigo when he was struck by the rock and killed. In light of this spacial proximity and the type of harm alleged, and considering the relationship of the claimants' to Rodrigo, the court concludes that the notice provided the Forest Service with sufficient information to investigate and assess a claim of negligent infliction of emotional distress. Thus, the administrative claim was therefore sufficient under 28 U.S.C. § 2675(a). The United States motion for summary judgment on this ground is therefore denied.

The United States also challenges the plaintiffs' negligent infliction of emotional distress claims on substantive grounds. The United States argues that as a matter of law the plaintiffs cannot prevail on these claims because: (1) none of the plaintiffs actually witnessed the rock strike Rodrigo; and (2) none of the plaintiffs have produced any evidence of a severe physical or mental illness as a result the incident.

■ Under Utah law, a claim for negligent infliction of emotional distress arises only when a defendant breaches a duty of care to the plaintiffs. In the event of such a breach, and even though a plaintiff was not physically injured by the breach, if the plaintiff was within the "zone of danger" created by the defendant's breach and suffers a severe emotional or mental injury as a result, a claim for negligent infliction of emotional distress exists. *See Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236, 239 (Utah 1992); *Johnson v. Rogers*, 763 P.2d 771, 780 (Utah 1988). "In other words, only those placed in actual peril as a result of defendant's breach of duty are allowed recovery...." *Hansen*, 830 P.2d at 239.

■ There is no dispute that at the time Rodrigo was struck by the rock, all but two of Rodrigo's siblings were inside the area identified by the Forest Service as the "Falling Rock Area." If, as plaintiffs claim (and remains to be determined), the

Forest Service did not adequately warn visitors of the rock fall hazard, the Forest Service breached its duty of care to all those who were inside the area. Thus, with the exception of Rafael and Karla Figueroa, the remaining sibling plaintiffs were inside the "zone of danger."

Even assuming that these plaintiffs were within the zone of danger, the United States argues that because they did not actually witness the impact on their brother, they have no claim for negligent infliction of emotional distress. In making this argument, the United States relies heavily on *Lawson v. Salt Lake Trappers, Inc.*, 901 P.2d 1013 (Utah 1995), a case in which the Utah Supreme Court held that the parents of a young girl who was hit by a foul ball at a baseball game could not prevail on a claim for negligent infliction of emotional distress. In *Lawson*, the court first concluded that the defendant had complied with its duty of care to the parents and their daughter, and that being struck by a foul ball is one of the natural risks of attending a baseball game. *Id.* at 1016. The court then held that because the parents did not actually witness the foul ball hit their child or see the foul ball coming, they could not as a matter of law prevail on their negligent infliction claim. *Id.*

*Lawson*, however, is inapposite. As noted in *Lawson*, the defendants did not breach any duty owed to the parents. Thus, no "zone of danger" was created. Even if the parents in *Lawson* saw the ball hit their child, because they were not in the zone of danger they could not recover. *Lawson* does not turn on the question of whether the parents actually witnessed the ball strike their child, but rather on the absence of any breach of duty to the parents.

In the present case, however, the plaintiffs assert that the Forest Service breached its duty of care to them by failing to adequately warn of the dangers of rock fall in Hanging Rock. The area where the rocks could and did fall, and the area

where the plaintiffs were standing, was within the "zone of danger" allegedly created by Forest Service's breach. While standing within that area, each of these plaintiffs was and remained in the "zone of danger," that is, they were in peril of the very same harm that had befallen their brother. *See Hansen*, 830 P.2d at 240; *Restatement (Second) of Torts* § 313, cmt. d. (1965) (commenting that recovery is available if the plaintiff was in the path of the harm or was in some other manner threatened with bodily harm other than through the emotional distress at the peril to another).

The United States is correct when it argues that even if the plaintiffs are within the "zone of danger," under Utah law they must also establish that they witnessed an injury to their brother caused by the negligence of the Forest Service in order to recover for negligent infliction of emotional distress. *See Hansen*, 830 P.2d at 240. However, the United States would have the court read this requirement to mean that the plaintiffs must have witnessed the immediate impact of the rock on their brother's head. This reading is far too narrow.

In adopting the "zone of danger" rule, Utah has adopted an objective standard that serves to identify those persons—those in danger of some peril—who are eligible to recover for negligent infliction of emotional distress. *See Johnson v. Rogers*, 763 P.2d 771, 780 (Utah 1988). Recently, the Utah Supreme Court described the rule as follows:

'Simply stated, the zone of danger rule allows one who is himself or herself threatened with bodily harm in consequence of the defendant's negligence to recover for emotional distress resulting from viewing the death or serious physical injury of a member of his or her immediate family.'

*Harnicher v. University. of Utah Med. Ctr.*, 962 P.2d 67, 69–70 (Utah 1998) (quoting *Clohessy v. Bachelor*, 237 Conn. 31, 675 A.2d 852, 857 (1996) (internal quotations omitted)). Under this rule, "a plaintiff may only recover for trauma caused by witnessing injury to a relative if the plaintiff is also within the zone of danger." *Hansen*, 830 P.2d at 243. While a plaintiff must have "viewed" or "witnessed" the death or serious physical injury of an immediate family member, there is no requirement that the plaintiff must have witnessed the immediate impact that caused the death or injury. The zone of danger rule prevents those who are outside of the peril created by a defendant from recovery for emotional distress. It does not bar recovery for those inside the zone of danger who, although they remain in peril, have for a brief moment averted their eyes.

Other states that have adopted the zone of danger rule have concluded that the witness requirement is satisfied when the person claiming emotional distress had a "contemporaneous observation of serious physical injury or death." *Bovsun v. Sanperi*, 61 N.Y.2d 219, 473 N.Y.S.2d 357, 358, 461 N.E.2d 843 (1984). In *Bovsun*, the plaintiffs, all family members, were driving in the family's station wagon when it suddenly experienced mechanical difficulties. The driver, Jack Bovsun, father and husband to the plaintiffs, left the station wagon and went around to the tailgate. While he was reaching in the tailgate window, a car driven by the defendant struck the station wagon. Jack Bovsun was seriously injured when he was pinned between the two vehicles. Although none of the plaintiffs actually saw their husband and father being struck by the car and seriously injured—they were both facing another direction—because they became instantly aware of his injuries and observed his condition immediately after he was struck, the court concluded that this contemporaneous observation was sufficient to recover for negligent infliction of emotional distress. *Id.* at 364, 461 N.E.2d 843.

To deny recovery to a family member simply because his or her eyes were focused in another direction at the exact moment of the accident would narrow the

distinction created by the zone of danger rule. The zone of danger rule already limits recovery based solely on the physical position of the plaintiff at the time of the event. Limiting recovery even further because of the position of a plaintiff's eyes strains logic. Such a requirement fails to recognize that it is the entire incident, and not just the split second of impact that creates the emotional distress.

■ In the present case the plaintiffs were within the zone of danger at the time Rodrigo was felled by the rock. Remaining in the zone of danger, they immediately ran to Rodrigo's aid and observed blood on Rodrigo's head and blood running in the river. They watched while others attempted to revive Rodrigo. During this entire time they remained in the zone of danger. It is undisputed that they witnessed Rodrigo's serious physical injuries. Although Utah courts have not spoken on this issue, this court believes that Utah would adopt the rational of *Bovsun* and permit a plaintiff, who himself was in the zone of danger, to recovery for negligent infliction of emotional distress based upon the contemporaneous observation of the serious physical injury and death of an immediate member of his family. *See Bovsun*, 473 N.Y.S.2d at 364, 461 N.E.2d 843. Thus, the court concludes that the plaintiffs contemporaneous observation of the death of their brother satisfies the witness requirement under the zone of danger rule.

Nevertheless, even if the zone of danger and witness requirements have been met, a plaintiff seeking recovery for negligent infliction of emotional distress must still prove that his severe emotional damages resulted, not from the distress at witnessing the injury to another, but from a fear of injury to himself. It is here where plaintiffs' claims stumble.

The court recognizes that no loss in life is greater than the loss of a loved one. The tragedy of witnessing the death of a beloved son or brother is beyond dispute. The sorrow that accompanies such a loss is genuine and deep. It is unlike the sorrows of everyday life—it lingers and it transforms. In almost every instance, the potential for serious emotional distress is present. Unfortunately, under Utah law, it remains that damages for this well-recognized and very real emotional distress are not recoverable. Instead, only damages for the emotional distress that flows from the fear of being struck down by the same harm that befell your loved one are recoverable. *See, e.g., Boucher v. Dixie Med. Ctr.*, 850 P.2d 1179, 1182 n. 17 (Utah 1992) (noting that sister who was within the zone of danger, and who witnessed the death of her sibling, could only recover if she suffered emotional distress concerning her own safety); *see Lawson*, 901 P.2d at 1016; *Hansen*, 830 P.2d at 240.

■ Rather than adopting section 436 of the Restatement (Second) of Torts, which would allow a family member in the zone of danger to recover for the emotional distress he or she suffered as a result of witnessing the serious physical injury or death of loved one,[18] Utah has stubbornly clung to the requirements of section 313 of the Restatement, despite vast criticism of this approach. *See Boucher*, 850 P.2d at 1181 & 1182 n. 17. Thus, under section 313, as understood by the Utah Supreme Court, the claimed emotional distress must arise from an independent fear of injury and not from the act of witnessing the death or injury of family member. *See Lawson*, 901 P.2d at 1016; *Boucher*, 850

18. Section 436 reads in part:
   (2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.
   (3) The rule stated in Subsection (2) applies where the bodily harm to the other results from his shock or fright at harm or peril to a member of his immediate family occurring in his presence.

P.2d at 1182 & n. 17; *Hansen*, 830 P.2d at 240. *But see Harnicher*, 962 P.2d at 69–70 (stating, in *dicta*, that recovery may be permitted " 'for emotional distress from viewing the death or serious physical injury of a member of his or her immediate family' ") (quotation omitted).

■■■] As absurd as this limitation is, it remains the law of Utah and this court is bound to apply it. In the name of "set[ing] rational and workable limits on liability" and limiting what the courts have speculated would be "unlimited recovery," *see* Boucher, 850 P.2d at 1182, Utah refuses to recognize what, to all, is the most recognizable cause of emotional distress— the tragic and sudden death of a loved one. Therefore, even though the plaintiffs witnessed the tragic death of their brother and were themselves in harm's way, because there is no evidence in the record that any of them suffered emotional distress from a fear of being struck by a rock while at visiting Hanging Rock, they cannot state a claim for negligent infliction of emotional distress. Therefore, the United States motion for summary judgment on this ground is granted.

## IV

S & L moves separately for summary judgment on several other fronts. First, it argues that under the Special Use Permit it had no duty to warn visitors to Hanging Rock of any dangerous conditions. It argues that the Forest Service retained total control over the closing and opening of the area and retained control over what, if any, warnings should issue.[19]

S & L is correct that under the terms of the Special Use Permit, it did not have unlimited authority to erect any signs in the picnic area. The Forest Service retained a right of prior approval on any signs. (*See* Special Use Permit at 11; Operating Plan, at 11 ¶ 5.) However, the

Special Use Permit imposed a continuing responsibility on S & L to "identify and abate hazardous conditions on the permit area which could affect the improvements or pose a risk of injury to individuals." (Special Use Permit at 3.) A rock fall hazard appears to fall within this category.

Nor does S & L dispute that, under the terms of both the Special Use Permit and the Operating Plan, it had a generalized duty to ensure the safety of all visitors to the picnic area. Indeed, under the terms of the Special Use Permit, S & L agreed to indemnify the United States for "any damage to life or property" arising out of S & L's occupancy or use of the picnic area. (Id. at 5 ¶ C.) S & L further agreed that the United States had "no duty to inspect [the] permit area or to warn of hazards and, if the United States does inspect the permit area, it shall incur no additional duty nor [sic] liability for identified or non-identified hazards." (Id.) Moreover, under the terms of the Operating Plan, S & L was obligated to "[r]emove rocks . . . or other similar natural objects which create a safety hazard within identified recreation site boundaries." (Operating Plan, at 14 ¶ C.2.A.8.a.) S & L was also required to "immediately notify the Forest Service of any hazards in the campground area which the Permittee and his representatives is [sic] not able to move." (Id. at ¶ C.2.A.8.b.)

In addition, as the record now exists, there remains a genuine factual dispute concerning S & L's knowledge of the rock fall danger at Hanging Rock. For example, S & L employee James Bailey has testified that he knew both that rocks were falling in the picnic area and that a young woman had been killed by a falling rock in 1994. (*See* Depo. of James Leroy Bailey, dated Apr. 16, 1998, at 10–11, 13, 34, attached to Pls.Mem. in Opp. to S & L's Mot. for

19. Although S & L raises an interesting point in that Rodrigo may have been outside the permit area when he was struck by the rock, and thus outside of the scope of any duty S & L may have had, S & L has failed to point to any evidence in the record to support this argument. Moreover, even if Rodrigo may have been outside the permit area, a contention still in dispute, the claimed negligence— *i.e.*, failure to warn or inadequate warning— occurred *within* the permit area.

Summ.J.) He also testified that he was aware that visitors continued to use the grassy picnic area beyond the pole fence. (*See id.* at 27–29.)

Based upon this record, it cannot be said that as a matter of law S & L had no duty to warn visitors of the rock fall danger at Hanging Rock. Genuine issues of material fact remain concerning S & L's knowledge of the hazard, its ability to act to abate and warn of that hazard, and the adequacy of any warnings given. Because a determination of these questions turns on disputed facts, S & L's motion for summary judgment on these grounds is denied.

S & L also argues that because it was not informed of the death of Elizabeth Holton before it signed the Special Use Permit, the failure of the United States to disclose this "material fact" voids the Permit and relieves S & L from any liability to the plaintiffs. S & L, however, has not filed a cross-claim against the United States for rescission. Without commenting on the merits of S & L's argument, in the context of summary judgment this claim cannot now be raised.

## Conclusion

After Ms. Holton was killed at the picnic area, Robert Easton, District Ranger for the Forest Service, and the person responsible for administering the Hanging Rock Picnic Area, met with other Forest Service employees to consider what warning signs should be prepared. When asked why the signs did not contain a more explicit warning other than "Falling Rock Area," for example, a warning of "Danger" or "No Trespassing," Ranger Easton testified that he did not use these common alert words because he and the other Forest Service employees believed that such language may expose the Forest Service to greater liability. (*See* Depo. Robert Easton, at 51–55.) In fact, Ranger Easton testified that "I think there's a feeling in the Forest Service if we put up a sign that says that the area is dangerous and something happens, I think there's a feeling that we're more liable under that condition." (*Id.* at 53.)

This rationale troubles the Court.

Contrary to Ranger Easton's understanding, fully describing a known danger or hazard does not increase the landowner's liability. Thus, Ranger Easton's justification for using the tepid "Falling Rock Area" warning, rather than a more forceful "Fatal Danger" warning, had, and has, no legal basis.

Hanging Rock Picnic Area was perceived by most visitors as a place of relaxation and safety; a place where one could bring the family for a cook-out and some carefree outdoor moments. In such a place, it is incumbent on the invitor, the United States, to take appropriate steps to ensure that people who are invited to picnic in this sanitized version of the outdoors are adequately apprised of hidden dangers, whether natural or man-made.

Communication is important. A sign that says falling rocks is not the same as a sign that says "Keep Away—Fatal Danger." The Forest Service should not have been reluctant to communicate the potential danger. Nevertheless, for reasons discussed at length in parts I–IV of this Memorandum Opinion and Order,

**IT IS ORDERED** that the United States of America's Motion for Summary Judgment is DENIED IN PART and GRANTED IN PART as discussed herein.

**IT IS FURTHER ORDERED** that S & L Service's, Inc.'s Motion for Summary Judgment is DENIED.

**IT IS FURTHER ORDERED** that a final pretrial hearing is scheduled for March 19, 1999, at 9:30 a.m. A proposed final pretrial order, signed by all parties, shall be submitted to the court no later than March 12, 1999.